1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4    USA                          §    CASE NO. 4:22-cr-00560
                                  §    HOUSTON, TX
5    VERSUS                       §    TUESDAY,
                                  §    JUNE 13, 2023
6    MARTINEZ, et al.             §    2:00 PM TO 5:09 PM

7                     <u>DETENTION HEARING</u>

8            BEFORE THE HONORABLE PETER BRAY
              UNITED STATES MAGISTRATE JUDGE
9
                        <u>APPEARANCES:</u>
10

11       FOR THE PARTIES:            SEE NEXT PAGE

12       COURT REPORTER:             AKEITA MICHAEL

13       COURT CLERK:                JASON MARCHAND

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21              Veritext Legal Solutions
              330 Old Country Road, Suite 300
22                  Mineola, NY 11501
              Tel: 800-727-6396 ▼ www.veritext.com
23
         Proceedings recorded by electronic sound recording; transcript
24              produced by transcription service.

25

```
1                              APPEARANCES:

2   FOR THE PLAINTIFF:          DOJ-Atr
                                Michael Lepage
3                               450 Golden Gate Avenue
                                10th Floor
4                               Suite 10-0101
                                San Francisco, CA 94102
5                               415-519-7866

6                               US ATTORNEY'S OFFICE
                                Matthew Roy Peneguy
7                               1000 Louisiana Street
                                Suite 2300
8                               Houston, TX 77005
                                713-567-9000
9
                                DOJ-Crm
10                              Christina Taylor
                                1301 New York Avenue NW
11                              Washington, DC 20530
                                202-679-1034
12

13  FOR THE DEFENDANTS:         SCHAFFER CARTER KENNEDY MAYS
                                Kent A. Schaffer
14                              James M. Kennedy
                                1001 McKinney Street
15                              Suite 1600
                                Houston, TX 77002
16                              713-228-8500

17

18

19

20

21

22

23

24

25
```

```
1                   HOUSTON, TUESDAY, JUNE 13, 2023, YEAR; 2:00 PM

2              CLERK:  All right.

3              THE COURT:  Be seated everyone.  United States v.

4    Calos Favian Martinez.  Who's here for the United States?

5              MR. PENEGUY:  Good afternoon, Your Honor, Matthew

6    Peneguy, Christina Taylor, and Michael Lepage from the United

7    States.

8              THE COURT:  How do you spell the last name Lepage?

9              MR. LEPAGE:  L-E-P-A-G-E.

10             THE COURT:  All right.  And for the Defendant?

11             MR. SCHAFFER:  Kent Schaffer along with James

12   Kennedy, Alejandro Ballesteros, and CJ Quintanilli, along with

13   Vanessa Waltaq.

14             THE COURT:  I was writing fast, but I didn't get the

15   last name.

16             MR. SCHAFFER:  Vanessa Waltaq, W-A-L-T-A-Q.

17             THE COURT:  I got, in addition to the things that I

18   had in front of me last time, I know have also the second

19   supplement to the opposed motion which details significant

20   discovery that has been produced and needs to be reviewed.  And

21   then, numerous character letters that are in docket entry

22   number 57-1, all of which I have read.  Are we ready to go?

23             MR. SCHAFFER:  We're ready.

24             MS. TAYLOR:  Yes, Your Honor.

25             THE COURT:  All right, call your first witness.
```

1           MS. TAYLOR:  Thank you, Your Honor, at this time the

2    United States calls Special Agent Bryan Engel.

3           THE COURT:  And your name was again, ma'am?

4           MS. TAYLOR:  Christina Taylor.

5           THE COURT:  Look at the clerk, raise your right hand.

6           CLERK:  Do you solemnly swear the testimony you will

7    give in the case now before the Court will be truth, the whole

8    truth, and nothing but the truth so help you God?

9           MR. ENGEL:  Yes, I do.

10          CLERK:  Have a seat.

11          THE COURT:  Also, while he's getting ready I read

12   Judge Hank's order at docket entry number 269.  It's sealed but

13   I presume that everybody has that and so he's ruled on that one

14   document that caused us to have to do this.  All right.  Go

15   ahead, state your name.

16          THE WITNESS:  My name is Bryan Engel.

17          THE COURT:  I can't even understand you.  If that's

18   how it's going to go, we got to improve right here.  Speak up.

19          THE WITNESS:  Bryan Engel.

20          THE COURT:  Thank you, go ahead.

21       DIRECT EXAMINATION OF SPECIAL AGENT BRYAN ENGEL

22   BY MS. TAYLOR:

23   Q    Thank you.  Agent Engel, where are you currently employed?

24   A    With the Federal Bureau of Investigation.

25   Q    And how long have you been employed with the FBI?

1    A    Since February of 2022.

2    Q    And what are your current duties with the FBI?

3    A    I'm a special investigator.  I investigate all matter of

4    federal crime in the AO that we're responsible for.

5    Q    And are you aware of an investigation into individuals

6    involved in the transmigrante industry operating in the

7    Brownsville, Texas and Matamoros, Mexico area?

8    A    Yes, I am.

9    Q    And just for background purposes, what is a transmigrante?

10   A    A transmigrante is an individual that purchases used

11   vehicles, normally cars or trucks, all across the United

12   States.  They bring them to Texas to cross into Mexico to

13   transit into South America to ultimately resell those -- resell

14   those items in Central America.

15   Q    And what mechanisms are required for a transmigrante

16   business to operate?

17   A    The transmigrante business is highly regulated by the

18   Mexican Government.  The transmigrante themselves have to have

19   permits, approvals, and pay fees.  These can only be done

20   through what's calls a patenta or a broker, which is used

21   interchangeable.  These brokers have to be approved,

22   authorized, insured, and licensed by the State of Mexico in

23   order to facilitate these documents.

24   Q    And what are forwarding agencies with respect to the

25   transmigrante operations?

```
 1   A     Forwarding agencies are business that were set up in close

 2   proximity to the Los Indios port of entry bridge to --

 3               THE COURT:  To the what, you're drifting off again.

 4               THE WITNESS:  The Los Indios port of entry bridge in

 5   order to help the transmigrante facilitate the processing of

 6   the customs paperwork and the paying of the fees to the customs

 7   agents.

 8   BY MS. TAYLOR:

 9   Q     And when did this investigation begin?

10   A     This investigation began in 2018.

11   Q     And why was this investigation initiated?

12   A     Multiple complainants provided information to federal

13   agents stating that there was some type of extortion scheme

14   surrounding the transmigrante industry that included the Gulf

15   Cartel.

16   Q     Now, what sources of evidence was obtained throughout the

17   course of this investigation?

18   A     Witness statements were gathered, meetings and phone

19   conversations were recorded, text messages and emails, iCloud

20   data was analyzed, financial records and bank statements were

21   analyzed, and other business documents were analyzed as well.

22   Q     And do some of these sources form your knowledge from

23   which you will be testifying to today?

24   A     Yes, they do.

25   Q     Now, did you personally participate in this investigation?
```

1    A    Yes, I did.

2    Q    And generally, what was your participation in this

3    investigation?

4    A    I assisted and conducted and surveillance of the co-

5    defendants.  I reviewed documentation and items that had been

6    entered, sorry.  Items that had been entered into evidence.  I

7    spoke with fellow case agents and then I planned a number of

8    arrest operations.

9    Q    Okay.  Now, in addition to the personal involvement you

10    had in this investigation, did you speak with other

11    investigators involved and review reports and other documents?

12    A    Yes, I did.

13    Q    Now, overall, what did this investigation reveal was

14    occurring in the transmigrante industry?

15    A    This investigation revealed that there was a multi-year

16    scheme surrounding the transmigrante industry in order to

17    monopolize and kind of control the flow of traffic in order to

18    like set prices.

19    Q    And was there a name that members involved in this scheme

20    called this monopolization and setting of prices?

21    A    Yes, members in the scheme referred to it as the pool.

22    Q    And what is -- what was the pool, how did the pool work?

23    A    The pool was a group of the higher percentage

24    transmigrante agencies in the Los Indios area that decided to

25    come together and set an agreed percentage on what they would

```
1    take from all of the money that was collected instead of

2    competing with one another in order to set a fixed price on all

3    the business that was taking place.

4    Q    And are you aware that 12 individuals have been in charge

5    -- have been charged as a result of this investigation?

6    A    Yes, I am.

7    Q    And were these individuals involved in this scheme that

8    you just described?

9    A    Yes, they were.

10   Q    Now, in addition to the pool requirements that you

11   mentioned, were there any other requirements for individuals or

12   businesses to participate in the transmigrante industry?

13   A    Yes.  Businesses or clients that wish to participate in

14   the transmigrante industry and export vehicles through Mexico

15   had to pay what was called a peso tax or an extortion tax.

16   Q    And where did this peso or extortion tax go to?  Who did

17   it get paid to?

18   A    All the peso proceeds were collected and given to Carlos

19   Martinez and then that was distributed to his family and

20   ultimately the Gulf Cartel.

21   Q    And you mentioned Carlos Martinez, is he one of the

22   individuals who was charged as a result of this investigation?

23   A    Yes, he is.

24   Q    And do you see him in the courtroom today?

25   A    Yes, I do.
```

```
 1   Q    Could you please point to him and describe an article of

 2   clothing he's wearing?

 3   A    Mr. Martinez is sitting at the other end of the table

 4   wearing an orange top.

 5   Q    Okay.  Now, these peso and pool payments that you're

 6   talking about, how are these payments made, in what form of

 7   currency?

 8   A    These payments were all made in cash.

 9   Q    Now, what if an individual operating in a transmigrante

10   industry failed to comply with pool and peso requirements?

11   A    Individuals operating within the transmigrante industry

12   who didn't comply with the requirements of the pool or the peso

13   agreement, after speaking with multiple witnesses and gathering

14   witness statements, they were verbally like addressed, hey, you

15   need to get in line.  If that didn't work, violence was taken

16   against themselves, their businesses, and their clients.

17   Q    And when you say violence, what type of acts of violence

18   would be taken against these individuals themselves, or their

19   families, or their clients?

20   A    Employees and clients were beaten, their vehicles were

21   stolen, their vehicles were firebombed, relatives of employees

22   of the transmigrante boarding agencies were kidnapped, and a

23   number of individuals were shot and lost their lives.

24   Q    And why would such repercussions be taken against those

25   who were failing to comply with the pool and peso requirements?
```

1    A    The pool set a specific price on, you know, how business

2    was going to be conducted.  Individuals who were operating

3    outside of the pool were able to set lower prices and therefore

4    undercut the bottom dollar and the money that the pool was

5    bringing in.

6    Q    And when you refer to these acts of violence, who was

7    committing these acts of violence?

8    A    We do not know.  It was various individuals on the Mexican

9    side of the river.

10   Q    And when you say you don't know, is that you don't have a

11   specific identity?

12   A    We do not.

13   Q    Who would determine when acts of violence should be

14   inflicted on individuals no in compliance?

15   A    Carlos Martinez.

16   Q    And how would Mr. Martinez become aware of an individual

17   not complying with the rules of the pool and peso?

18   A    The other co-defendants in their transmigrante like

19   forwarding agencies would report these issues up to the

20   associates of Mr. Martinez and then those associates, for

21   example, Marco Medina would report what was going on in the

22   business to Carlos and then on occasion the transmigrante

23   forwarding agency representatives themselves would bring the

24   issues to Mr. Martinez.

25   Q    And were communications such as WhatsApp chats collected

 1   as part of this investigation memorializing these complaints

 2   and explaining of issues?

 3   A     Yes.

 4   Q   Now, Mr. Martinez --

 5             THE COURT:  What are they -- just, can you be a

 6   little more -- what do they show us?  You got the WhatsApp

 7   texts, what do they show?

 8             THE WITNESS:  Your Honor, we --

 9             THE COURT:  With respect to him since that's what

10   we're here for is to talk about something that he would have

11   been responsible for (indiscernible).

12             THE WITNESS:  Yes, Your Honor.  We have a number of

13   conversations that were captured on a border crossing

14   inspection of one of the co-defendants, Mr. Marco Medina, that

15   shows a string of conversations in reference to one of the

16   victims of the recent -- the attacks in the transmigrante

17   industry, they're complaining about her being out of compliance

18   and needing to be shown a lesson and have a beating put on her.

19             THE COURT:  Well, who is he talking to?

20             THE WITNESS:  Mr. Martinez is communicating with

21   Marco Medina, one of the co-defendants.

22             THE COURT:  So, Mr. Medina, co-defendant, was

23   communicating with this Defendant here, Mr. Martinez about a --

24   one of the people not being in compliance and what specific --

25   what did it say?

1           MS. TAYLOR:  Your Honor, if I may show the witness

2    some exhibits that include examples of these?

3           THE COURT:  Yeah, I mean, I don't want to go through

4    this whole thing and have it be very generalized.  If you're

5    going to get there, fine.  But it sounded like you were moving

6    on.

7           MS. TAYLOR:  We can get -- we'll move there now, Your

8    Honor.  Thank you.  If I can present these exhibits, I believe

9    Defense has them.

10          THE COURT:  Can I just say, so, there's people who

11   can't find a place to sit.  Do you want to sit up here next to

12   -- is that okay to the Marshalls, can they sit in the jury box?

13          MR. WOERMBKD:  Are they state (indiscernible)?

14          THE COURT:  I don't know who they are, they're just

15   standing there.  I want them to -- you can observe though, come

16   on up.

17          MR. SCHAFFER:  It'd be the front row.

18          MS. WALTAQ:  There's some space right here.

19          MS. TAYLOR:  A copy for his Honor and the court

20   reporter.

21          THE COURT:  They can sit there, that's fine, that

22   would be good.  Yeah.  Sorry everybody, it was distracting me.

23   All right, you've handed me some -- and the witness some

24   exhibits, is that right?

25          MS. TAYLOR:  Correct, Your Honor.

```
 1              THE COURT:  All right, go ahead.

 2              MS. TAYLOR:  If I may continue?  Thank you.

 3              THE COURT:  Yep.

 4   BY MS. TAYLOR:

 5   Q    Okay, you mentioned that you -- that texts messages were

 6   reviewed as part of this case.  I'm going to back you up a

 7   little bit.  Did you become familiar with an individual in this

 8   matter known as Consuela Ramos?

 9   A    Yes, we did.

10   Q    And what type of work was Consuela Ramos doing in 2018 and

11   2019?

12   A    Ms. Ramos was in the transmigrante industry.

13   Q    Okay.  And into August of 2018 was Ms. Ramos in compliance

14   with the pool and peso rules that we just discussed?

15   A    No, she was not.

16              THE COURT:  What year is that again?

17              MS. TAYLOR:  We are in 2018, Your Honor.

18   BY MS. TAYLOR:

19   Q    And did you observe some chats between Mr. Medina and Mr.

20   Martinez with respect to Ms. Ramos?

21   A    Yes, I did.

22   Q    Okay.

23              MS. TAYLOR:  Your Honor, if I may for reasons of

24   efficiency, I'm going to move all 13 exhibits into evidence,

25   and we will get to them in due course.
```

1          THE COURT:  Any objection to these for this purpose?

2          MR. SCHAFFER:  Yes, Your Honor.  There several of the

3    exhibits all in the (indiscernible).  I think (indiscernible).

4          THE COURT:  Just tell me what the objection is?

5          MR. SCHAFFER:  Well, the translations are totally

6    improper and wrong.  We have had them translated by a

7    professional service.  What the Government -- well, the top of

8    the page has a text message expansion.  The bottom of the page

9    has somebody's very loose translation.  So, for example,

10   supposeldley on the Government's translation our client says,

11   she needs her ass beat.  Our professional interpreters who

12   translated said she need; you all need to give her hell.  Two

13   totally different things.

14         THE COURT:  Do you have that person here to --

15         MR. SCHAFFER:  They're supposed to be here.

16         THE COURT:  -- (indiscernible) these conflicting.

17         MR. SCHAFFER:  Mr. Kennedy went out to call to see

18   where they are.  They were here at the last hearing.

19         THE COURT:  So, just a minute.  So, when it's your

20   turn can you give me the conflicting translation?

21         MR. SCHAFFER:  Yes, sir.

22         THE COURT:  In the meantime --

23         MR. SCHAFFER:  This is apparently some agent just

24   sort of guessing in (indiscernible).

25         THE COURT:  So, can we just lay some foundation for

 1    what this is and then I will listen to it and when it's your

 2    turn, you can tell me what the conflicting translation is.

 3    Okay.  If this was a jury trial and there were people who

 4    shouldn't hear this then yeah we would do what you're talking

 5    about.  But that's not necessary in this context.

 6              MS. TAYLOR:  Thank you, Your Honor.

 7              THE COURT:  Go ahead, lay some foundation for what

 8    this is.

 9    BY MS. TAYLOR:

10    Q    Okay.  We're going to start with exhibits one, two, and

11    three.  Do you recognize what those are?

12    A    Yes, I do.

13    Q    And could you tell us what they are?

14    A    These are images taken from Marco Medina's cell phone when

15    he was subjected to a border inspection while crossing back

16    into the United States.

17    Q    And so, the top of each one, two, and three are actually

18    photographs of the phone and the text messages.  Is that fair

19    to say?

20    A    That's correct.

21    Q    Okay.  And then the bottom of exhibits one, two, and three

22    consists of translations of those text messages?

23    A    Correct.

24    Q    And at the top do you see it says Conduent Transcriptions.

25    Was this translated by a company that these were outsourced to,

1    from what you can see on these exhibits?

2    A    Yes, it is.

3    Q    Okay.

4            THE COURT:  Well, what is that company?  What is

5    Conduent Transcription?  Are they a certified transcription

6    company, are they -- is D. Luna a person certified to interpret

7    English to Spanish and Spanish to English?  Do you know

8    anything about them?

9            MS. TAYLOR:  They are not certified.  I can proofer

10   that for the Court.  It's not a -- these are not certified

11   translations at this juncture.

12           THE COURT:  Who is this?  Is this a company that the

13   FBI uses?

14           MR. PENEGUY:  It's a contractor that HIS and

15   Department of Justice have used.

16           THE COURT:  Do you know anything about how reliable

17   you understand these transcriptions to be?  (indiscernible)

18   about that?

19           MR. PENEGUY:  Judge, to the best of my knowledge, you

20   know, I was told that these, you know, were accurate

21   transcriptions.  I myself am not a Spanish speak, so I can't

22   make an opinion on that.

23           THE COURT:  So, who is D. Luna and D.S. Camile?

24           MR. PENEGUY:  They are employees of Conduent who did

25   the translation.

 1              THE COURT:  Are they native Spanish speakers?  I
 2   mean, do we know anything about this?
 3              MR. PENEGUY:  I'm afraid I don't, Your Honor.  I just
 4   know that these are not certified translations.
 5              THE COURT:  All right.  Just tell me what you want me
 6   to know about these and then you all can do whatever you want
 7   to do.
 8              MR. SCHAFFER:  Well, my objection's obvious.  Their
 9   translated by somebody who's not certified, we don't know who
10   they are, we don't know if they speak Spanish or if they speak
11   English.  So, for all those reasons I don't think any predicate
12   has been established that would make these admissible.
13              THE COURT:  I haven't admitted them.
14              MR. SCHAFFER:  I'm sorry.
15              THE COURT:  I haven't admitted them yet.
16              MR. SCHAFFER:  Oh, I know I was just putting my
17   objection.
18              THE COURT:  I'm just going to read them though, hold
19   on.  Who's on which side?
20              THE WITNESS:  Your Honor.
21              THE COURT:  Whose texts are on the left side?
22              THE WITNESS:  The left side is Mr. Martinez, and the
23   right side is Mr. Medina.
24              THE COURT:  Just hang on, he doesn't need to read --
25   let me just read these.  All right, I've read these, one, two,

```
 1    and three.  I mean, it is, you know, I don't know what to do

 2    with this.  If what you're telling me is that we don't know who

 3    the translators are, that they're not certified to translate,

 4    we don't know if they're native Spanish speakers or native -- I

 5    don't know what they are, native English speakers, native

 6    Spanish speakers.  And he's telling me he doesn't know anything

 7    about the quality of this transcription.  So, I mean, I'm --

 8    why don't we move on from these and do your whatever's next.

 9              MS. TAYLOR:  Okay.  Could I get the Court's brief

10    indulgence.  Thank you.  All right, thank you, Your Honor.

11    BY MS. TAYLOR:

12    Q    I'm going to draw your -- you mentioned an individual by

13    the name Consuela Ramos was operating in a transmigrante

14    industry on -- around September of 2018, correct?

15    A    Yes, that's correct.

16    Q    And she was not in compliance with making peso or pool

17    payments, correct?

18    A    That's correct.

19    Q    Did you become aware of an individual by the -- that has

20    the initials of E.O. during the course of this investigation?

21    A    Yes, I did.

22    Q    And what was E.O's relationship to Ms. Ramos if you know?

23    A    He was an employee.

24    Q    And what type of work did E.O. do for Ms. Ramos?

25    A    He would escort transmigrante clients across into Mexico.
```

```
 1   Q    Now, drawing your attention to September 27, 2018, did
 2   E.O. escort transmigrante clients into Mexico on that date?
 3   A    Yes.
 4             THE COURT:  Wait, what date again, sorry?
 5             MS. TAYLOR:  September 27th of 2018.
 6             THE COURT:  Okay.
 7   BY MS. TAYLOR:
 8   Q    Now, did Ms. Ramos hire security for transmigrante clients
 9   operating through her company?
10   A    Yes, that transmigrante forwarding agency had security on
11   the Mexican side of the Los Indios BOE.
12   Q    And did E.O. advise if there typically was security
13   provided for transmigrantes crossing over the bridge when he --
14   that E.O. escorted them?
15   A    Yes.  In an interview he stated there was normally
16   security present.
17   Q    Now, on September 27, 2018, when E.O. crossed with clients
18   over the bridge, was there any security present?
19   A    No, there was not.
20   Q    And what if anything, happened to E.O. when he crossed
21   into Mexico on September 27, 2018?
22   A    When E.O. crossed into Mexico escorting his clients his
23   vehicle was rammed by a Chevy Tahoe, five individuals jumped
24   out and approached E.O., began beating him.  According to him
25   they said this is what happens when you're a dick, we work for
```

1    Quata.

2    Q    And what is the significance of saying we work for Quata?

3    A    Quata is a nickname known by Carlos Martinez.

4    Q    To you knowledge were text messages -- was iCloud -- a

5    search warrant done for Mr. Martinez's iCloud?

6    A    Yes, a search warrant was executed on Mr. Martinez's

7    iCloud account.

8    Q    And were there text messages in Spanish observed regarding

9    removing security detail on September 27, 2018?

10    A    Yes, there was.

11    Q    But these text messages were in Spanish, correct?

12    A    Yes.

13    Q    And although translated are not certified translations?

14    A    Correct.

15    Q    If I can draw your attention to February 22, 2019.  Did

16    the investigation uncover that a kidnapping occurred on that

17    day?

18    A    Yes, it did.

19    Q    And were the individuals kidnapped individuals that go by

20    the name of -- initials of A.A. and F.C.?

21            THE COURT:  What's the data again?

22            MS. TAYLOR:  That's February 22nd of 2019.

23            THE COURT:  Go ahead, what are the initials?

24            MS. TAYLOR:  A.A. and F.C.

25    BY MS. TAYLOR:

1    Q    And what if any connection A.A. and F.C. have to Ms.

2    Ramos?

3    A    A.A. was the daughter of one of Ms. Ramos's employees.

4    Q    And was F.C. A.A's friend?

5    A    F.C. was A.A's boyfriend.

6    Q    What type of work or did A.A's father do for Ms. Ramos?

7    A    A.A's father had a special permit from the Mexican

8    Government that allowed him to verify customs documents.

9    Q    And in February of 2019 was Ms. Ramos in compliance with

10   pool and peso rules?

11   A    No, she was not.

12   Q    What did A.A. and F.C. say about the kidnapping?

13   A    After they were kidnapped and upon their release a little

14   while later A.A. was told this is because of what your father

15   does for work, he needs to find a new job, or he will disappear

16   himself.

17   Q    Now, if I can draw your attention to March 7, 2019.  Did

18   Ramos in connection with her work with transmigrante cross into

19   Mexico?

20   A    Yes, she did.

21   Q    Did Ms. Ramos cross into Mexico with an individual by the

22   -- with the initials of R.H.?

23   A    Yes, she did.

24   Q    And what R.H's relationship to Ms. Ramos?

25   A    R.H. was a client of Ms. Ramos.

```
 1   Q    And what occurred when R.H. and Ms. Ramos crossed into
 2   Mexico?
 3   A    When Ms. Ramos and R.H. crossed into Mexico an unknown
 4   like, excuse me.  An unknown individual came up next to their
 5   vehicle and shot both of them numerous times.
 6   Q    And --
 7              THE COURT:  Shot both of them what?
 8              THE WITNESS:  Numerous times.
 9              THE COURT:  Okay.
10   BY MS. TAYLOR:
11   Q    And what if any injuries did R.H. sustain?
12   A    R.H. was killed at the scene.
13   Q    And what if any injuries did Mr. Ramos sustain?
14   A    She suffered significant injuries that kept her in the
15   hospital for a while.
16   Q    Now, during the course of this investigation did you
17   become familiar with an individual with the initials of L.G?
18   A    Yes, I did.
19   Q    And in 2019, what type of work was L.G. doing?
20   A    L.G. was in the transmigrante industry.
21   Q    And around October of 2019, was L.G. complying with pool
22   and peso rules?
23   A    No, L.G. was not.
24   Q    And who was L.G. out of compliance?
25   A    L.G. had sourced a patenta that was not part of the pool
```

1    and was not authorized to work by the pool.

2    Q    Now, did L.G. receive any phone calls regarding her acting

3    against the pool rules?

4    A    Yes, she did.

5    Q    And did she know who this call was from?

6    A    No, the call was made from an unknown individual.

7    Q    And what was said to L.G. during this phone call?

8    A    During this phone call L.G. stated that the caller said

9    she needed to stop looking for a new patenta, that they knew

10   where her young grandchild went to school.

11   Q    On October 24, 2019, did a --

12            THE COURT:  Okay, hold on.  You're going so fast I

13   can't write --

14            MS. TAYLOR:  Sorry.

15            THE COURT:  -- this stuff down, just --

16            MS. TAYLOR:  Yes, Your Honor.

17            THE COURT:  All right, what's the next date?  Say it

18   again.

19            MS. TAYLOR:  October 24, 2019.

20            THE COURT:  All right.

21   BY MS. TAYLOR:

22   Q    Did a firebombing of a transmigrante vehicle occur on

23   October 24, 2019?

24   A    Yes, it did.

25   Q    What if anything did this firebombing of the vehicle have

1    to do with L.G?

2    A     This vehicle belonged to a transmigrante individual who

3    was using the services of a forwarding agency that was using

4    L.G's patenta who was, you know, not in compliance with the

5    pool.

6    Q    If I can draw your attention to November 5, 2019.  Was

7    there a shooting that was connected to L.G?

8    A     Yes, there was.

9    Q     And did this shooting occur in Mexico?

10    A     Yes, it did.

11    Q     And who was shot on November 5, 2019?

12    A     There was three victims of this shooting.  One was L.G's

13    nephew, one was a worker of L.G., and one who we assume to be a

14    worker, but not able to be questioned because he died at the

15    scene.

16    Q    And you mentioned that one of these individuals were

17    killed at the scene, what happened to the other two individuals

18    who were shot?

19    A     They both died as well.

20    Q    If I can draw your attention to November 15th of 2019.

21    Did the investigation uncover an attack on an individual with

22    the initials of J.C?

23    A     Yes, it did.

24    Q     And what was J.C's relationship to L.G?

25    A     It was a client of her transmigrante forwarding agency.

1    Q    And on November 15, 2019, did J.C. take a car to Mexico as

2    part of his work with transmigrante?

3    A    Yes, he did.

4    Q    And what occurred when J.C. crossed into Mexico?

5    A    As J.C. crossed into Mexico he was driving a vehicle that

6    was towing another.  He stated in a witness interview that he

7    was cutoff and stopped in the road, he was approached, and the

8    individuals who approached him demanded his vehicle keys.  He

9    refused, he was stabbed in the head, and the vehicle that he

10    was driving and the vehicle that he was towing, like towing,

11    was taken.

12    Q    And if I can draw your attention to November 17, 2019.

13    Did the investigation uncover an attack on an individual with

14    the initials O.G?

15    A    Yes, it did.

16    Q    And what O.G's relationship to L.G?

17    A    O.G. is L.G's brother.

18    Q    And on November 27, 2009, near the Los Indios port of

19    entry in Mexico?

20    A    Yes, O.G. had just crossed the bridge and was, I believe,

21    in his interview stated he was heading towards Reynosa.

22    Q    And what happened after he crossed into Mexico?

23    A    He stated that as he was driving down the road a vehicle

24    came up next to him and fired multiple times in his vehicle.

25    Q    What if any injuries did O.G. obtain after being shot at?

1    A    O.G. was cut by glass from the window shattering from the

2    rounds impacting it.

3    Q    Now, you testified earlier that part of L.G's

4    noncompliance was hiring a new patenta.

5    A    Correct.

6    Q    Did that patenta go by the initials of J.H?

7    A    Yes, they did.

8    Q    Did J.H. experience any issues after he began working with

9    L.G?

10   A    He did.

11   Q    Can you please describe what some of those issues were?

12   A    He received an anonymous phone call that stated he needed

13   to stop working.  He was not authorized to work as a patenta in

14   the transmigrante industry and that they knew where his office

15   was and where his family was.

16   Q    Now, did J.H. at any point meet with an individual by the

17   name of Diego Ceballos-Soto?

18   A    Yes, he did.

19   Q    And how many occasions did he meet with Mr. Ceballos-Soto?

20   A    It was two in person meetings.

21   Q    And what occurred at these meetings?

22   A    At these meetings Ceballos-Soto tried to relay to --

23          THE COURT:  And is that the same as the Defendant in

24   this case, the fourth one from the bottom of the --

25          MS. TAYLOR:  Yes, it is, Your Honor.  That was the

```
 1   follow-up question.

 2              THE COURT:  Okay.

 3   BY MS. TAYLOR:

 4   Q    So, Ceballos-Soto is a co-defendant in this case.  Is that

 5   correct?

 6   A    Yes, he is.

 7   Q    And during the investigation did you learn if Ceballos-

 8   Soto had any connection to Mr. Martinez?

 9   A    Yes, he was an associate of Mr. Martinez.

10   Q    Okay.  And if you could tell us what occurred in the

11   meetings between Mr. Ceballos-Soto and J.H.

12   A    Ceballos-Soto tried to have J.H's licensing for his

13   patenta moved over to him.

14   Q    Did J.H. also receive WhatsApp chat messages from

15   Ceballos-Soto?

16   A    Yes, he did.

17   Q    And what if you can just generally describe what Mr.

18   Ceballos-Soto referenced in those WhatsApp messages.

19   A    After the in-person conversations failed to retrieve the

20   licensing, Ceballos-Soto sent the patenta holder a number of

21   snapshots from new articles highlighting the recent violence at

22   the Los Indios POE to include the recent shooting and murder of

23   the three subjects related to L.G.

24   Q    If I can draw your attention now to December 12th of 2009.

25   Did L.G. have a meeting?
```

```
 1                    THE COURT:  Of what year?

 2                    MS. TAYLOR:  I'm sorry, that's my fault, Your Honor,

 3     December 2019.

 4                    THE COURT:  Okay.

 5     BY MS. TAYLOR:

 6     Q     Did Ceballos-Soto have a meeting with L.G?

 7     A     Yes, he did.

 8     Q     Did Ceballos-Soto say who he was working on behalf at that

 9     meeting on December 12, 2009, with L.G?

10     A     Yes, Mr. Martinez.

11     Q     And what did he discuss with L.G. at that meeting?

12     A     Her issue of noncompliance in the pool and peso and the

13     penalty she had to pay fines in to make those, you know, those

14     allegations true.

15     Q     And who did Ceballos-Soto say those fine who was required

16     -- who did Ceballos-Soto say was requiring those fines to be

17     paid?

18     A     Mr. Martinez.

19                    MS. TAYLOR:  At this time, Your Honor, if I can ask

20     the witness to look at exhibit nine.

21                    THE COURT:  Okay.

22                    MS. TAYLOR:  Which is also in that package.

23                    THE COURT:  Okay, just let me get to it.  All right.

24                    MS. TAYLOR:  Thank you.

25     BY MS. TAYLOR:
```

```
 1   Q    Can you tell us what is -- what exhibit nine is?

 2   A    Exhibit 9 is a screen shot of a text conversation with

 3   Diego Ceballos-Soto that was found on Carlos Martinez's iCloud

 4   account.

 5   Q    And that was during the execution of the search --

 6             THE COURT:  It's with who, who, who?  The same

 7   Ceballos-Soto that we've been talking about.

 8             THE WITNESS:  Yes.  Yes, Your Honor.

 9   BY MS. TAYLOR:

10   Q    And that was pursuant to the execution of the search

11   warrant on Mr. Martinez iCloud account, correct?

12   A    Yes, correct.

13   Q    In this -- the photograph in this chat chain, what is the

14   significant -- what is being shown in that photograph?

15   A    The photograph is a list of the amount of money that L.G.

16   owes in order to pay the peso fines.

17   Q    And did L.G. advise that this list was written up when she

18   met with Ceballos-Soto?

19   A    Yes, she did.

20             MS. TAYLOR:  Your Honor, at this time the Government

21   would see to move Exhibit 9 into evidence.

22             MR. SCHAFFER:  I have no objection.

23             THE COURT:  All right, it's in.

24             (Exhibit 9 admitted into evidence.)

25   BY MS. TAYLOR:
```

1  Q    And did L.G. in fact pay fines to be given back to Mr.

2  Martinez?

3  A    Yes, she did.

4  Q    And did she pay $47,000 on December 16, 2019?

5  A    Yes, she did.

6  Q    And who did she physically give that money to?

7  A    An associate of Mr. Martinez by the name Izagary.

8  Q    And did she again pay money to -- in the amount of $42,000

9  to Mr. Izagary on December 20th of 2019?

10 A    Yes, she did.

11 Q    Now, did the investigation -- after L.G. paid these fines,

12 did she comply with pool and peso rules?

13 A    Yes, she did.

14 Q    As far as you are aware, other investigators are aware,

15 did she experience anymore violence after she begin compliance?

16 A    No, she did not.

17 Q    And on that same note backing up to Ms. Ramos, I'm not

18 sure if I asked you this.  Did she continue in the

19 transmigrante industry after the shootings?

20 A    No when she recovered from her injuries she left the

21 transmigrante industry.

22 Q    After Ms. Ramos left the transmigrante industry, did she

23 experience any further violence?

24 A    No, she did not.

25 Q    Now, earlier back in 2012, were you aware of a kidnapping

1   that Mr. Martinez was involved in?

2   A    Yes, I was.

3   Q    And did you become aware of that kidnapping through

4   interviewing an individuals with the initials L.B?

5   A    Yes, we did.

6   Q    And what L.B's relationship to Mr. Martinez back in 2012?

7   A    Excuse me.  According to the interview that L.B. gave the

8   interviewing agents, L.B. was in a business dispute with Mr.

9   Martinez in 2012.

10  Q    And what did L.B. advise occurred with this kidnapping in

11  2012?

12  A    L.B. stated that he was approached by a man that he only

13  knew as the guard at gunpoint and told to get in the car.  He

14  was hooded and drove to an undisclosed location; he didn't know

15  where he was.  He said that he could kind see through the cloth

16  that was over his face and that he saw Osiel Jr. and Mr.

17  Martinez in the room with him.

18              THE COURT:  Who, he saw who?

19              THE WITNESS:  Osiel, Jr.

20              THE COURT:  How do you spell that?

21              THE WITNESS:  O-S-I-E-L, Jr., J-R, Your Honor.

22  BY MS. TAYLOR:

23  A    L.B. stated that a gun was put to his head and the trigger

24  was pulled, but the fun fell on an empty chamber.  Everyone

25  began laughing and then he was knocked over and Mr. Martinez

1   and Mr. Osiel, Jr. began kicking him repeately.

2               THE COURT:  How could -- did he see Mr. Martinez, is

3   that what you're trying to me?

4               THE WITNESS:  Yes, Your Honor.  He stated in the

5   interview that the cloth wasn't super thick, and he could kind

6   of see into the room.

7   BY MS. TAYLOR:

8   Q    And Osiel Jr. is, what if any is he relationship to Mr.

9   Martinez?

10  A    They were friends growing up.

11  Q    Was L.B. ultimately released from the situation?

12  A    Yes, he was.

13  Q    If I can draw your attention to 2017.  What type of work

14  was L.B. doing in 2017?

15  A    In 2017, L.B. had gotten into the transmigrante industry.

16  Q    Did L.B. have an additional interaction with Mr. Martinez

17  in 2017?

18  A    Yes, they had an in-person meeting.

19  Q    And where did this in-person meeting take place?

20  A    Texas Roadhouse.

21  Q    And is that in Brownsville, Texas?

22  A    It is in Brownsville, Texas, yes.

23  Q    And what did L.B. advise occurred during this meeting?

24  A    They talked about the firebombing of some offices --

25              THE COURT:  They, being Martinez and L.B., right?

```
 1              THE WITNESS:  Yes, Your Honor.  L.B. and Martinez
 2   discussed recent fires at some properties that L.B. owned in
 3   Mexico.  L.B. stated that Martinez acknowledged the fires and
 4   stated that he had disrespected the Cardenas family.  He stated
 5   that he'll do what is necessary and that he would even kill
 6   L.B. if needed because he would -- he needed to protect the
 7   family.  L.B. stated that if you were going to kill me, you
 8   would have done it in 2012.  I know it was you, I saw you in
 9   the room.  Mr. Martinez stated that he -- that was a long time
10   ago and that they needed to find a way a work together because
11   Mr. Martinez could make things very difficult for L.B.  That he
12   had friends with the enforcers in Matamoros and Reynosa.
13   BY MS. TAYLOR:
14   Q    And what if anything is Mr. Martinez's connection to the
15   Cardenas family?
16   A    He is the son in law of Osiel Cardenas.
17              THE COURT:  And I mean, let's just pretend I don't
18   know anything.  Who is Osiel Cardenas?
19              THE WITNESS:  Osiel Cardenas is a former CDG cartel
20   boss.
21              THE COURT:  And that stands for?
22              THE WITNESS:  The Cartel del Gulfo.
23              THE COURT:  So, go ahead.
24              MS. TAYLOR:  Court's brief indulgence.
25              THE COURT:  I'm just letting you know that you all
```

1   know a lot of things that I don't know.  I mean, a little while

2   ago I was looking at a packing case.  So, I don't know what

3   you're talking about unless you tell me, okay.

4               THE WITNESS:  Yes, Your Honor.

5               THE COURT:  Please.

6               THE WITNESS:  I understand.

7               THE COURT:  Thank you.  Since you're taking a second,

8   I have just something separate from this going on and I'm

9   hearing my phone ring.  Can I just make sure that there's not a

10  problem.

11              MS. TAYLOR:  Of course.

12              THE COURT:  Can I just be one minute?

13              MS. TAYLOR:  Thank you, Your Honor.

14              (Off the record)

15              (On the record)

16              THE COURT:  Thank you, sorry.  So, (indiscernible)

17  say again.  So, who -- Mr. Martinez is associated or is related

18  to who, what family, say it again, and who's is who?  List what

19  you just said in very rapid concession.

20              THE WITNESS:  Yes, Your Honor.  Carlos Martinez is

21  the son-in-law of Osiel Cardenas through his marriage to Osiel

22  Cardenas's daughter, Celia.  I hope I pronounced that right.

23              THE COURT:  Okay.  Are you ready?

24              MS. TAYLOR:  Yes, thank you, Your Honor.

25  BY MS. TAYLOR:

1    Q    During the course of the investigation, was it discovered

2    whether or not Mr. Martinez owned any properties?

3    A    Yes, it did.

4    Q    And where does he own properties?

5    A    He owns properties in Texas and in Mexico.

6    Q    And what are the approximate values of those properties?

7    A    There's a combined total they're multimillion dollar

8    houses.

9    Q    If I can direct your attention to exhibit 11?

10   A    Yes.

11   Q    And do you recognize what's being shown in exhibit 11?

12   A    Yes, that is an arial photograph taken of the residence at

13   Solera Drive.

14              THE COURT:  At where, where?

15              THE WITNESS:  Solera Drive.

16              THE COURT:  Where's is that?

17              THE WITNESS:  In Mission Texas.

18              THE COURT:  Okay.

19   MS. TAYLOR:

20   Q    And who does that property belong to?

21   A    Mr. Martinez.

22              MS. TAYLOR:  Your Honor, at this time the Government

23   would move exhibit 11 into evidence.

24              MR. SCHAFFER:  No objection.

25              THE COURT:  All right, so admitted.

```
 1                  (Exhibit 11 admitted into evidence.)

 2   BY MS. TAYLOR:

 3   Q    All right if I can ask you to take a look at exhibit 12.

 4   Do you recognize what's being shown in exhibit 12?

 5   A    It is a residential property located at Travis Street.

 6   Q    And where is that -- is that located in Mission Texas as

 7   well?

 8   A    Yes, it is.

 9   Q    And who does this property belong to?

10   A    Mr. Martinez.

11              MS. TAYLOR:  Your Honor, at this time the Government

12   would move exhibit 12 into evidence.

13              MR. SCHAFFER:  No objection.

14              THE COURT:  All right.

15              (Exhibit 12 is admitted into evidence)

16   BY MS. TAYLOR:

17   Q    And can I ask you to take a look at exhibit 13?

18   A    Exhibit 13 is a residence that belong to Mr. Martinez in

19   Cancun, Mexico.

20              MS. TAYLOR:  Your Honor, at this time we would move

21   exhibit 13 into evidence.

22              MR. SCHAFFER:  Same.

23              THE COURT:  All right.

24              (Exhibit 13 is admitted into evidence.)

25   BY MS. TAYLOR:
```

1  Q    Now, when you -- when the search warrant was executed on

2  Mr. Martinez's iCloud were other items of luxury observed?

3  A    Yes, there was.

4  Q    What type of items?

5  A    Various expensive watches like Rolex and OMEGA.  Expensive

6  handbags, luggage, a number of reservations at a resort,

7  football stadium seats, a picture of luxury vehicles, pictures

8  of a yacht, pictures of a private plane.

9  Q    During the investigation was it learned whether or not Mr.

10 Martinez owned any vehicles?

11 A    Yes, a number of vehicles.

12 Q    And what are some types of vehicles that he owned?

13 A    Has a Porsche SUV, two Range Rovers, two BMW SUVs, two

14 Mercedes SUVs, a Mercedes Sedan, and two vintage cars, one

15 being a Ford and one being a Chevrolet.

16 Q    Now, you mentioned photographs of a private jet.  Did the

17 investigation uncover whether or Mr. Martinez ever owned a

18 private jet?

19 A    Yes, it did.

20 Q    And, who was that jet, registered to?

21 A    That jet was registered to a pilot out of Georgia by the

22 name of Allen Cohen.

23 Q    And was Mr. Cohen interviewed as part of this

24 investigation?

25 A    He was.

```
 1   Q    And what did Mr. Cohen advise about ownership of that --
 2              THE COURT:  How do you spell that guy's name?
 3              MS. TAYLOR:  C-O-H-E-N.
 4   BY MS. TAYLOR:
 5   A    Mr. Cohen told HSI agents in an interview that he was the
 6   owner of the plane on paper simply, that Mr. Martinez wanted
 7   the plane registered in Cohen's name to hide his assets from
 8   the Mexican Government.
 9   Q    Did Mr. Cohen work for Mr. Martinez?
10   A    Yes, he did.  And Mr. Cohen was a pilot on retainer for
11   Mr. Martinez.
12   Q    How was Mr. Cohen paid by Mr. Martinez?
13   A    Mr. Cohen stated that he had a number -- he was usually
14   paid in wire transfers to his Bank of America account in
15   Georgia and that on occasion he would be paid in cash by
16   Izagary.
17   Q    Now, did Mr. Cohen advise whether or not he flew Mr.
18   Martinez or family members to any locations?
19   A    He did.  He stated that he flew them a number of times to
20   Vagas, Colorado, and various places in Mexico to include
21   Cancun.
22              THE COURT:  Flew who, who?
23              THE WITNESS:  Mr. Martinez, Mr. Martinez's family,
24   various associates of Mr. Martinez.  He didn't give a full
25   passenger manifest, Your Honor.
```

```
1   BY MS. TAYLOR:

2   Q    Now, during the course of the investigation, did you

3   discover any bank accounts connected to Mr. Martinez?

4   A    Yes, Mr. Martinez had US and Mexican bank accounts.

5   Q    Were significant cash deposits observed being made to

6   those bank accounts?

7   A    There was, yes.

8   Q    During the investigation was it learned whether or not Mr.

9   Martinez owned any foreign businesses?

10  A    It was, yes.

11  Q    And what --

12            THE COURT:  When you say significant deposits, I

13  don't know what that means.

14            THE WITNESS:  There was --

15            THE COURT:  Like what's significant to me is very

16  likely not significant to the Government.

17            THE WITNESS:  Yes, Your Honor, I understand.  I don't

18  have a figure on those.  What I saw --

19            THE COURT:  More than a million, more than ten

20  million, less than 10,000?  I really have no idea what you're

21  talking about.

22            THE WITNESS:  I know there was a number of CTRs that

23  were reported?

24            THE COURT:  CTR means what for the record.

25            THE WITNESS:  Currency transaction report.  Anything
```

```
 1    in a single day over $10,000 in monetary value has to be

 2    reported to the financial crimes network.  And like over the

 3    span of a few years, I believe, there was like over 50 of

 4    those.

 5              THE COURT:  (indiscernible)?

 6              THE WITNESS:  50.

 7              THE COURT:  50 million?

 8              THE WITNESS:  CTRs.

 9              THE COURT:  But how much -- they're 10,000 a piece at

10    least, so whatever, so, 50 times 10,000, over how many years?

11              THE WITNESS:  I don't have an exact number of years,

12    Your Honor.

13              THE COURT:  Okay, approximate it for me.

14              THE WITNESS:  I think three or four, Your Honor.

15              THE COURT:  Okay, great.  Continue, please.

16              MS. TAYLOR:  Thank you.

17    BY MS. TAYLOR:

18    Q    And what businesses did Mr. Martinez own in Mexico?

19    A    A laundry mat and a casino.

20    Q    Now, was Mr. Martinez arrested in connection with this

21    investigation and indictment on November 15, 2022?

22    A    Yes, he was.

23    Q    I'm going to draw your attention to November 16, 2022.

24    Did investigators in this case have contact with Mr. Martinez's

25    wife?
```

1    A    Yes, they did.

2    Q    And where was it that investigators made contact with Ms.

3    Martinez -- Mr. Martinez's wife?

4              THE COURT:  And her name is what?  So, that I don't

5    get confused.

6              MS. TAYLOR:  That is Celia Martinez.

7              THE WITNESS:  Celia Martinez, Your Honor.

8    BY MS. TAYLOR:

9    A    A Range Rover was observed leaving the Salara property in

10   Mission Texas.  The vehicle was one of the vehicles registered

11   to Carlos Martinez.  Hidalgo County Constable conducted a

12   traffic stop on that vehicle, identified Mr. Martinez's wife,

13   Celia.  And two minors were in the vehicle.  She was informed

14   that her and the minors were free to go, but the vehicle was

15   going to be detained.  There was a bag in the back in the back.

16   Q    And what was contained in that bag?

17   A    When asked what was in the bag she stated cash.  They

18   asked how much, and she stated she didn't know.  They asked who

19   it belonged to; she said the house.  The report reads that more

20   questions were attempted to be asked, but she refused to answer

21   and left the scene.

22   Q    And was the vehicle in fact seized?

23   A    Yes, it was.

24   Q    And was the bag seized?

25   A    Yes, it was.

```
1    Q    Did you observe the cash in the bag?

2    A    I did not personally, no.

3    Q    I'm sorry.  During the course of the investigation, did

4    investigators observe the cash in the bag?

5    A    Yes, there was.

6    Q    And how was the cash stored in the bag?

7    A    The cash was broken up into smaller amounts in white

8    envelopes.

9    Q    And what if anything was done with the white envelopes?

10   A    Those white envelopes were sent for fingerprint analysis.

11   Q    And what were the results of the fingerprint analysis?

12   A    A number of the envelopes came back testing -- that has

13   positive matches for Mr. Martinez's fingerprints and then an

14   associate of Mr. Martinez, Pedro Calvillo.

15   Q    And is Pedro Calvillo also a co-defendant in this case?

16   A    Yes, he is.

17   Q    Now, what if anything was learned about Mr. Martinez

18   regarding foreign travel?

19            THE COURT:  Can I just stop you?  How much money was

20   in the bag?

21            THE WITNESS:  It's $375,000, Your Honor.

22            THE COURT:  375.  And how much was in each envelope

23   approximately?

24            THE WITNESS:  I'm unaware of that amount, Your Honor,

25   in each envelope.
```

```
 1              THE COURT:  Was it 100 envelopes or five?  I'm just
 2    curious, but maybe it doesn't matter.
 3              THE WITNESS:  I think the fingerprint report, I
 4    believe, this is approximate, I think 10 or so-ish envelopes,
 5    Your Honor.
 6              THE COURT:  Thank you.  Go ahead, please.
 7    BY MS. TAYLOR:
 8    Q    During the investigation was it discovered that Mr.
 9    Martinez traveled out of the country?
10    A    Yes, it did.
11    Q    Will he travel into Mexico?
12    A    Yes, he did.
13    Q    Approximately, between January 1, 2022, and November 22,
14    2022, how many times did Mr. Martinez travel into Mexico?
15    A    15.
16              THE COURT:  What was the end date there?
17              MS. TAYLOR:  The end date is November 22, 2022.
18              THE COURT:  Thank you.
19    BY MS. TAYLOR:
20    Q    After Mr. Martinez was arrested -- or when Mr. Martinez
21    was arrested on November 15, 2022, was he interviewed?
22    A    Yes, he was.
23    Q    Was this interview provided after he was given his Miranda
24    rights?
25    A    Yes, it was.
```

1  Q    Was the interview recorded?

2  A    Yes, it was.

3  Q    Did Mr. Martinez -- where did Mr. Martinez advise he had

4  been just prior to his arrest?

5  A    Mr. Martinez stated that they were dropping off her

6  daughter at boarding school in Switzerland.

7  Q    Did Mr. Martinez advise if he had gone anywhere else

8  besides Switzerland?

9  A    Yes, they went to Italy and then into France.

10          MS. TAYLOR:  Thank you, Your Honor, I have no further

11  questions for this witness.

12          THE COURT:  Cross?

13          MR. SCHAFFER:  Thank you, sir.  Can we get some

14  exhibits there, please.

15          THE COURT:  You know, we had some exhibits stickered

16  a while back and they didn't stick very well.  Did we get some

17  more, Jason?

18          CLERK:  (indiscernible).

19          THE COURT:  You can just write on them.

20          CLERK:  Okay.

21          THE COURT:  That's fine.  Sorry.  I have post-it

22  notes if you want them.

23          MR. SCHAFFER:  (indiscernible) Ms. Waltaq's numbering

24  them.

25          THE COURT:  Yeah, sorry.  They apparently were

1    underutilized and just lost their stick.

2              CLERK:  We have boxes of those at the office.

3              THE COURT:  You want to bring these up?

4              MS. SCHAFFER:  Then we'd ask him to take them to

5    Court.

6              THE COURT:  I don't use them, so, go ahead.

7              CROSS EXAMINATION OF SPECIAL AGENT BRYAN ENGEL

8    BY MR. SCHAFFER:

9    Q    So, Agent, you started out talking about the transmigrante

10   business.  You used the phrase that this industry is heavily

11   regulated by the Mexican Government, correct?

12   A    Yes, that's the investigation led to believe based on the

13   import (indiscernible).

14   Q    (indiscernible).

15   A    Yes.

16   Q    Could I ask you to speak in the mic (indiscernible)?

17   A    Yes.

18   Q    Okay.  And what you mean by that is the Mexican Government

19   only license, issue a license to give different companies in

20   Mexico, they can process the paperwork, correct?

21   A    If that's what you're stating, I don't have the facts as

22   to based on how many or how little the Mexican Government would

23   authorize.

24   Q    That's not within the FBI reports that you helped produce

25   today?

1    A     There's a number of reports from HIS and FBI.

2    Q     Is it in there?  All right, well, we're pulling up that

3    report.  You're aware of the fact that the companies regulated

4    by the Mexican Government in Mexico are called patentas,

5    correct?

6    A     Yes.

7    Q     All right.  And a patenta receives the paperwork on the

8    vehicle that's going to crossover and has to process that

9    paperwork, correct?

10   A     Correct.

11   Q     What the patenta does is -- let me back up here.  These

12   vehicles coming into Mexico are not permitted to stay in

13   Mexico.  They have to pass through Mexico and into Central and

14   South America, correct?

15   A     That is correct.

16   Q     All right.  So, the Mexican Government tells these

17   patentas that the cargo that's being approved has to go all the

18   through Mexico and out of country or the patenta has to pay a

19   big fine, correct?

20   A     That is correct.

21   Q     And it's not just the vehicle that is being regulated,

22   it's the contents of the vehicle as well, correct?

23   A     I believe so, yes.

24   Q     Another words, these vehicles will often be packed full of

25   consumer goods that are going to Central and South America

1    mostly for resale, correct?

2    A    Some of them are, I mean, you can see it if you, you know,

3    drive down the interstate in Brownsville for a number of

4    minutes.

5    Q    Okay.  Sometimes it's an empty vehicle, but often times

6    the vehicle is packed full of consumable goods, correct?

7    A    Sometimes, yes.

8    Q    Okay.  The forwarding or the patenta has somebody who will

9    actually inspect the car as it enters Mexico and then inspect

10   the car as it leaves the southern border of Mexico, correct?

11   A    I believe so, yes.

12   Q    And that inspector has to make sure whatever was in that

13   car when it entered Mexico has to have the same contents when

14   it leaves Mexico a few days or a week later, correct?

15   A    The car, the contents, all of it are regulated, yes.

16   Q    Right.  So, because that patenta could be fined

17   significantly by the Mexican Government, they want to make sure

18   that the forwarding companies their dealing with are reputable

19   and straight up companies, correct?

20   A    Sure.

21   Q    Okay.  So, the five patentas in Mexico have exclusive

22   relationships with many of the forwarding companies on the

23   American side, correct?

24   A    Yes.

25   Q    All right.  And all together there may be five or six

1    forwarding companies that have exclusive relationships with

2    those patentas, correct?

3    A    Correct.

4    Q    So, let's say that I, hypothetically, want to take my old

5    Chevrolet and drive it through Mexico and see it in South

6    America.  I still have to get approved by a patenta, correct?

7    A    Yes.

8    Q    All right.  But as somebody who doesn't have a

9    relationship with a patenta, they're going to make me go to a

10   forwarding company they do have a relationship with, correct?

11   A    That would make sense.

12   Q    All right.  And in order to do that these forwarding

13   companies that are permitted to work with the patentas will

14   make me pay a percentage to them in order for them to handle

15   the business, correct?

16   A    There is a, you know, fee that must be paid for the

17   services, that's why they're providing that business, yes.

18   Q    Correct.  A lot of the complaints that the FBI and the HSI

19   were getting were from people who wanted to have a forwarding

20   company that didn't have an exclusive relationship with the

21   patenta on the Mexico side, correct?

22   A    That was well before my time on the investigation, so I

23   can't.

24   Q    Well before you, all right.  So, let's talk about that.

25   You've been an FBI agent for a little bit over a year, correct?

1   A    Correct.

2   Q    You've gone down to the Quantico, what six months ago?

3   A    A year ago.

4   Q    Oh, okay.  Well, I noticed you turned when the prosecutor

5   asked you what you did, you said I'm a special investigator.

6   Is that different than a special agent?

7   A    No, it's I'm an investigator.  I'm the criminal

8   investigator.

9   Q    Are you also referred to as a special agent?

10  A    A special agent, yes.

11  Q    Okay.  And after you graduated from Quantico, did you get

12  sent down Rio Grande Valley?

13  A    Yes, I did.

14  Q    So, you've been there since February of 2022.

15  A    I've been there since June of 2022.

16  Q    And you know this investigation started going on back in

17  2011, correct?

18  A    From my knowledge, the investigation started in 2018.

19  Q    In what?

20  A    In 2018.

21  Q    You didn't know this investigation started in 2011?

22  A    Who started it in 2011?

23  Q    There was an original investigation involving the very

24  same people and companies in 2011, correct?

25  A    If there was an investigation before the one that we're

```
 1   currently talking about, I, you know, that's not something that

 2   I would have seen.

 3   Q    Are you the case agent?

 4   A    I am one of the case agents, yes.

 5   Q    And so, the only thing -- let me back up here a minute.

 6   So, we were talking about these forwarding companies, and you

 7   had said that they have gotten together and agreed among them

 8   to agree on a price, and they agreed that's what they were all

 9   charging, that same price, to reduce competition.  Correct?

10   A    That is according to witness interviews, yes.

11   Q    Were you aware that -- you know the names of Mireya

12   Miranda?

13   A    Yes.

14   Q    Mireya Miranda's a defendant in this case, correct?

15   A    She is.

16   Q    How about Sandra Guerra?

17   A    Yes.

18   Q    Miguel Caballero

19   A    Yes.

20   Q    And you know the name of Luis Quantez.

21   A    I do.

22   Q    And Mr. Quantez was in the transmigrante business and then

23   got out of it and later he died, correct?

24   A    Correct.

25   Q    Right.  Now, (indiscernible) let me show what I marked as
```

```
1    exhibit (indiscernible) and ask you if you've seen this

2    document before from 2011?

3    A    I'm not sure what this document is.  It's all in Spanish.

4    Q    Well, look at the last two pages.  Are you telling me

5    you've never seen the document?

6              THE COURT:  If he doesn't know what it is --

7    BY MR. SCHAFFER:

8    A    Sir, there's been a number of documents --

9              THE COURT:  Wait, wait, wait, you don't get to just

10   add.  He doesn't know what it is.

11             MR. SCHAFFER:  Okay.

12             THE COURT:  You want to ask him some more questions.

13   BY MR. SCHAFFER:

14   Q    Have you ever seen that document?

15   A    No.

16   Q    You are aware of the fact that in 2011 those people I just

17   named came up with an agreement to all charge the same price

18   for transmigrante services in order to quit undercutting each

19   other's profits.  You didn't know about that?

20   A    No, sir.  Like I said, I'm relatively knew to this

21   investigation, there's a lot of information, there's a lot of

22   data, this spans a long time.  I'm in the process of trying to

23   not only prepare for this testimony --

24             THE COURT:  I'm sorry, he didn't know, he didn't

25   know.
```

1  BY MR. SCHAFFER:

2  Q   Well, if you're investigating an anti-trust of price

3  fixing case, wouldn't it be important to you that there was a

4  written agreement in existence in essence (indiscernible) were

5  going to charge the same amount in order to reduce competition

6  among ourselves.  Wouldn't that be important as an agent

7  investigating anti-trust?

8         THE COURT:  I think it would be important, go ahead.

9         THE WITNESS:  Yeah.

10        THE COURT:  I mean, it's not going to make any

11 difference, I get it, it's important.

12        MR. SCHAFFER:  Okay.  Would you like a copy of the

13 exhibit, Your Honor.

14        THE COURT:  Sure.  What is it?

15        MR. SCHAFFER:  It's a written agreement among those

16 four individuals that they would set a price for transmigrante

17 services because kept undercutting each other so bad, they were

18 all about to go out of business.  And so, they came up with an

19 agreement.  May I continue with questions?

20        THE COURT:  Sure.

21 BY MR. SCHAFFER:

22 Q   You're aware of the fact that almost every defendant in

23 this case at one time or another has been interviewed by the

24 FBI or HSI, correct?

25 A   I do believe that a number of interviews have been -- have

1    taken place, yes.

2    Q     Including Mr. Martinez, correct?

3    A     I'm not sure, he might have been by HSI.  I don't have

4    purview on all of the interviews and who's --

5    Q     Didn't you say when he got arrested he waived his rights

6    and consented to an interview?

7    A     From my understanding he acknowledged his rights, and he

8    did interview after was arrested, yes.

9    Q     Were you there?

10   A     No.

11   Q     You realize it was tape recorded?

12   A     I do.

13   Q     Have you heard the tape recording?

14   A     I did.

15   Q     One of the things that Mr. Martinez --

16          THE COURT:  Okay.  Can I just kind of say.  You need

17   to slow down because he just asked you was he interviewed, and

18   you said I don't know.  But now, you're telling us that of

19   course he was interviewed, and I listened to the tape

20   recording.  So, I'm not sure where the disconnect is, but just

21   slow down and listen to the questions and answer the question

22   as asked, not the version that you wish had been asked or the

23   ones that you want to have answered.  Okay, please?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  That will be helpful, thank you.

1    BY MR. SCHAFFER:

2    Q    So, you're aware that two-hour interview back in November

3    of 2022, Mr. Martinez said that, yeah, there was an agreement

4    among all the companies that they would charge the same amount?

5    You're aware of that, aren't you?

6    A    I can't recall the entire two-hour interview.

7    Q    He --

8              THE COURT:  Did he during the interview acknowledge

9    that there was an agreement amongst the five companies to

10   charge the same price, yes or no?

11             THE WITNESS:  Your Honor, I didn't listen to the

12   interview in its entirety.

13             THE COURT:   All right.  So, you don't know.

14             THE WITNESS:  I have no idea.

15   BY MR. SCHAFFER:

16   Q    Is there anybody on your investigative team that knows

17   less about this case than you?

18             MS. TAYLOR:  Objection, Your Honor, argumentative.

19             THE COURT:  Yeah, that's a little argumentative, I

20   get it.

21   BY MR. SCHAFFER:

22   Q    Well, Mr. Martinez sat there and answered questions for

23   two hours there.

24   A    He answered questions to the lead investigating agency,

25   which is Homeland Security.

```
1    Q    So, that makes the answer to my question yes, correct.

2    A    He did, yes.

3    Q    Okay.  One of the things that he was asked about were

4    payments to the Cartel, correct?

5    A    Again, I have no idea.

6    Q    You're unaware of the fact that for two hours he sat there

7    and told about payments that he was forced to make to the

8    Cartel for transmigrantes going across the border?

9    A    Sir, like I previously stated, I did not listen to the

10   interview in its entirety.

11   Q    Well, that's the first thing that was talked about for

12   probably 15 minutes was about how he was getting shaken down by

13   the cartel, correct?

14             MS. TAYLOR:  Objection, Your Honor, it's been asked

15   and answered.  I'm not even sure there was a question there.

16             MS. SHAFFER:  Well, Your Honor --

17             THE COURT:  Well, I guess, I mean, you're asking

18   questions, he doesn't know the answer.

19   BY MR. SCHAFFER:

20   Q    Do you recall Mr. Martinez for at least 10 to 15 minutes

21   explaining how he owned a casino over in Mexico?

22   A    I do not.

23   Q    Do you recall him saying that the cartel shut off the

24   power to the casino and refused to turn the power back on

25   unless he paid several hundred thousand dollars?
```

```
 1   A    I do not.

 2              THE COURT:  You know, you can proofer this stuff to

 3   me in a minute.

 4              MR. SHAFFER:  Oh, I'm going to.

 5              THE COURT:  Yeah, yeah, okay.  Well, then we don't

 6   probably need to beat him up about it.  He said he doesn't

 7   remember pretty much anything about the interview.  You tell me

 8   anything you want me to know about the interview, but when it's

 9   your chance to present evidence.  At this point, I get it.

10              MR. SHAFFER:  All right.

11   BY MR. SHAFFER:

12   Q    All right.  Well, let's talk about a few things that maybe

13   we can agree on.

14   A    Okay.

15   Q    You're aware of the fact that Mr. Martinez no criminal

16   history, correct?

17   A    Yes.

18   Q    You're aware of the fact that he was born here in

19   Houghton, Texas and that he's an American citizen, right?

20   A    Yes, he is.

21   Q    You're aware of the fact that he has numerous family

22   members in the Houston area, reaching all the way down to the

23   Rio Grande Valley, correct?

24   A    I'm going to take your word for it.  I don't understand

25   his entire family lineage, but if you say it's true.
```

1    Q    All right.  You know, hang on a second.  You're aware of

2    the fact that when he was arrested in November of '22, it

3    wasn't hard to find him, was it?

4    A    I'm not sure, I wasn't present during his arrest.

5    Q    He was arrested having dinner at a restaurant down in the

6    valley, correct?

7    A    Like I said, I was not a participant --

8         THE COURT:  Are you aware of any difficulties in

9    finding him?

10        THE WITNESS:  I am not.

11        THE COURT:  Okay, go ahead.

12   BY MR. SCHAFFER:

13   Q    At the time he was arrested he had no fake IDs or false

14   identification on him, correct?

15   A    Again, I have no knowledge of his arrest, what was on him

16   during his arrest.

17   Q    Nobody told you that he did (indiscernible).

18   A    They didn't say that he did and there wasn't any report.

19   Q    Nobody told you he had a weapon on him, correct?

20   A    No.

21   Q    Nobody told you that he resisted arrest, correct?

22   A    Didn't hear about that.

23   Q    I'm sorry?

24   A    I did not hear about that.

25   Q    Nobody told you that he attempted to flee, correct?

1    A    No.

2    Q    And you have no evidence to suggest that he does attempt

3    to flee, correct?

4    A    Just the evidence that we stated.

5    Q    That's not evidence of anything.  I'm asking you if you

6    possess any --

7              THE COURT:  Well, wait, wait, wait, I'm the one who's

8    going to figure out what all this evidence means.

9              MR. SHAFFER:  But my question is, do you have

10   evidence --

11             THE COURT:  Ask him the questions --

12             MR. SHAFFER:  -- showing that he has --

13             THE COURT:  Wait a minute, wait a minute, wait a

14   minute.  He just answered your question.  It's the Government's

15   view that his contacts criminal and otherwise with a foreign

16   country as well as business contacts as well as his

17   participation in this crime in Mexico constitutes a flight

18   risk.  That's what they're telling me.  And I'm the one who's

19   going to decide whether that's right.  And you're asking him to

20   characterize the evidence and I'm telling you that that's my

21   job and to move on, please.

22             MR. SCHAFFER:  Well, I won't dispute that, but what I

23   was asking and what I meant to ask and perhaps my words were

24   (indiscernible) is whether there was evidence, that he

25   possessed evidence showing that this Defendant has an intent to

1    flee.

2              THE COURT:  An intention to flee.  Did he tell you or

3    anybody else that he intends to flee?

4              THE WITNESS:  I have not heard, myself personally, of

5    that.

6              THE COURT:  Did you uncover a plan that he intends to

7    flee, whether inside of text messages or otherwise?

8              THE WITNESS:  Me personally, no.  I have no knowledge

9    of the other investigators, Your Honor.

10             THE COURT:  I mean you -- you're the case agent.

11   You're speaking for the government right now.  You don't have

12   any information about that, do you?

13             THE WITNESS:  To the best of my knowledge, no.

14             THE COURT:  Okay.

15   BY MR. SCHAFFER:

16   Q    Well, so let's talk about the evidence and how it relates

17   to similar Defendants.  You're aware of the fact that six of

18   the Defendants in this case, all of whom live down on the

19   Mexican border, were released on bond.  Correct?

20   A    I believe a number of them were released on bond, yes.

21   Q    Okay.  One of them in particular is a guy named Roberto

22   Garcia who goes by the name of (indiscernible).  Do you know

23   who that individual is?

24   A    Yes, I do.

25   Q    He's out on bond.  Correct?

```
 1    A    If you say so.  I don't have a docket memorized, who's

 2   out, who's not, who's been arraigned, who's still in custody.

 3    Q    Now, (indiscernible) is somebody who according to some of

 4   your informants was actually making threats against people.

 5   Correct?

 6    A    Yes.  Some of the reports show that he was making threats.

 7    Q    He lives (indiscernible), does he not?

 8    A    He does.

 9    Q    And you don't know if he's out on bond or not.  You agree

10   it would be in the court record.  Correct?

11    A    Yes.

12    Q    All right.  Marco Medina was somebody who ran one of the

13   orbiting companies that you testified about.  Correct?

14    A    He was.

15    Q    He's somebody who was supposedly involved in making

16   threats to people.  Correct?

17    A    I don't know if he made threats directly.  I know that he

18   was one of the ones that shared information with Mr. Martinez.

19    Q    Okay.  So supposedly, it's Mr. Martinez's right-hand man.

20   Correct?

21    A    Supposedly, yes.

22    Q    All right.  He's out on $100,000 bond.  Correct?

23    A    I believe so.

24    Q    He lives in the Rio Grande Valley.  Correct?

25    A    I think he's living somewhere else.  I'm not sure of his
```

1   whereabouts.

2   Q    How about Carlos Yzaguirre?  Is he on bond?

3   A    I'm not sure.  I think so.

4   Q    How about Mireya Miranda?

5   A    I believe she is.

6   Q    Sandra Medina?

7   A    She is.

8   Q    And all those individuals I named are people that lived

9   down in the Rio Grande Valley.  Correct?

10  A    They did, yes.

11  Q    They did or they do?

12  A    They did.  I believe some of them have relocated closer to

13  their current family, I think, in the San Antonio area.

14  Q    You talked about a number of trips.  Let me

15  (indiscernible).  You talked about a number of trips that Mr.

16  Martinez made back in, in think, 2022 across the Mexican

17  border.  Correct?

18  A    Correct.

19  Q    All right.  I'm going to give you -- because I know that -

20  - and by the way, you recall that we were set for a hearing in

21  this case a month or so ago, and right before the hearing, the

22  government turned over 180 separate items -- discovery items --

23  that you had reviewed.  Correct, sir?

24  A    I have not reviewed every single item in discovery, no.

25  That's a --

```
 1              THE COURT:  (indiscernible) ask again.
 2    BY MR. SCHAFFER:
 3    Q    Do you recall -- I'm going to actually give you a copy of
 4    what I'm going to mark as Exhibit 40 for identification
 5    purposes for the government.  It's a spreadsheet that you sent
 6    as discovery items that this agent reportedly reviewed.  Have
 7    you seen this index before, sir, that's Exhibit 40?
 8    A    Yes, sir.  I believe -- I mean, I've seen this before,
 9    yes.  I can't describe --
10    Q    Is that an index of the items that the government gave you
11    to review in order to prepare for the hearing?
12    A    There was a number of items.  I didn't get an itemized
13    list like this.  I reviewed reports.
14    Q    So we got the itemized list but you never got anything
15    showing what it was the government wanted you to review?
16    A    I've -- I mean, yes.  I mean, I didn't get this kind of
17    list.  I got the reports that you were given, yes.
18    Q    And read them.  Correct?
19    A    Yes.
20    Q    All right.  Do you recall that reviewing a report from --
21    and by the way, Pamera Dolan is one of the agents in this case.
22    Correct?
23    A    Yes, she was the case agent that I relieved when I got to
24    the office.
25    Q    All right.  And when you testified that Carlos Martinez
```

```
 1    had made 16 trips across the border, did that come from a

 2    report or did you look at actual crossing records?

 3    A    It came from a report that were pulled from CVP crossing

 4    records.

 5    Q    All right.  Let me show what I've marked as Defendant's

 6    Exhibit 36.

 7              MR. SCHAFFER:  May I approach, Your Honor?

 8              THE COURT:  Sure.  You can always approach.

 9              MR. SCHAFFER:  Okay.

10    BY MR. SCHAFFER:

11    Q    Take a look at that report, please, and tell me if that's

12    the report that you were referring to.

13    A    Yes, it is.

14    Q    All right.  So let's talk about what else that shows.

15    First of all, Mr. Martinez's primary residence in down the

16    Valley.  Correct?

17    A    Yes.

18    Q    And you'd agree with me that since the border is right

19    there next to McAllen and right there next to Brownsville, it's

20    not unusual for people that live down there to cross over the

21    border.

22    A    No, it's very natural.

23    Q    So if you look at that report, you'll see that it also

24    details that Marco Medina, one of the co-Defendants who's on

25    bond, made 33 trips during that same time period.  Correct?
```

1    A    That's what the report, yes.

2    Q    Carlos Yzaguirre made 255 trips during that same time

3    period.  Correct?

4    A    Yes.

5    Q    Mr. Martinez made 16, right?

6    A    Correct.

7    Q    So Mireya Miranda made 61 trips back and forth across the

8    border.  Correct?

9    A    Yes, sir.

10   Q    And lastly, Sandra Medina made 133 trips across the

11   border.  Correct?

12   A    Correct.

13   Q    During the same time period when Mr. Martinez made 16

14   trips.  Correct?

15   A    Yes, sir.  That's what the reports states.

16   Q    All those individuals I named are out on bond, are they

17   not?

18   A    I believe they are, yes.

19   Q    And they were on bond with agreement of the government,

20   weren't they?

21   A    That was between them and the government.  I had nothing

22   to do with the bond.

23   Q    Now you're aware of the fact that almost every time Mr.

24   Martinez crossed back in the United States he was questioned in

25   what we call secondary.  Correct?

1    A    Yes, I believe a number of the individuals on this

2    document were questioned in secondary.

3    Q    Okay.  And every time Mr. Martinez was pulled into

4    secondary and questioned about his purposes for being in

5    Mexico, he was cooperative with the agents, wasn't he?

6    A    I have no knowledge of his cooperation with CBP officials

7    at the port of entry.

8    Q    Did anybody tell you he wasn't cooperative?

9    A    No one told me he was not cooperative, no.

10   Q    Are you aware of the fact that Mr. Martinez had numerous

11   conversations with HSI about what was going on in his casino

12   down in Mexico?

13   A    I did not.  It had no relevance to my part of this

14   investigation.  I --

15   Q    (indiscernible)

16          THE COURT:  So hold on.  One more time.  Stop working

17   into your answers explanations for why you don't know

18   something.  If you know, tell him what you know.  If you don't

19   know, say I don't know.  That is all, please.

20          THE WITNESS:  Yes, Your Honor.  I don't know.

21          MR. SCHAFFER:  You don't know what?

22          THE COURT:  What you just asked.  Whether he stated

23   to the HSI agents information about his troubles with his

24   casino.  Are -- you said -- are you aware of those discussions

25   and instead of just telling me, no, I'm aware, he said, that

 1    wouldn't have any relevance to my investigation and that's not

 2    an answer and so I was trying to help you.

 3              MR. SCHAFFER:  Thank you, sir.

 4              THE COURT:  All right.

 5    BY MR. SCHAFFER:

 6    Q    All right.  So let's talk a little bit --

 7              THE COURT:  Because every time we have to go --

 8    quibble back and forth on a question, it makes the question

 9    last 30 more seconds and if we do that for 50 questions, it's

10    going to be 25 extra minutes, and I'm not in mood for this.

11    Answer the question.  Do you understand?

12              THE WITNESS:  Yes, Your Honor.

13              THE COURT:  Thank you.

14    BY MR. SCHAFFER:

15    Q    So let's move on to the specific acts of violence that you

16    testified about today.  You'd agree with me that almost all of

17    these incidents that you testified about were performed by

18    (indiscernible)?

19    A    Correct.

20    Q    And almost all the incidents that you testified about the

21    government was aware of four to five years ago.

22    A    I believe so, yes.

23    Q    All right.  So let's talk -- the first one you mentioned

24    was somebody by the name of Eloi Overra.  Let me have number 6.

25              MS. TAYLOR:  Objection.  Your Honor, if we could just

1    ask initials be used.  There is a protective order in place to

2    at this time protect the identities of these witnesses and

3    victims so we were trying to use initials since this is a

4    public part.

5           THE COURT:  Use the initials, please.

6           MR. SCHOENFELT:  Yes, sir.

7    BY MR. SCHAFFER:

8    Q    So let's talk about EO.  EO is the person who came in to

9    the -- to meet with the government along with a woman by the

10   name of Consuelo -- oh, are you using initials on this?

11          MS. TAYLOR:  No.  Since her name is already out in a

12   piece of evidence that's the government presenting.

13   By MR. SCHAFFER:

14   Q    EO and Consuelo Ramos came in to meet with government

15   agents on October 3rd of 2018.  Correct?

16   A    I believe so.

17   Q    Would it help you if I put your -- the report in front of

18   you?

19   A    Sure.

20   Q    So EO and Consuelo Ramos come in to meet with agents for

21   the government and they describe and incident where EO was

22   beaten up across the Mexican border.  Correct?

23   A    Correct.

24   Q    And EO -- the reason that it gets brought up today is EO

25   supposedly says, well, after this guy beat me up, he said, this

1   is what you get for being a whatever.  I work for Quanta.

2   That's supposedly what EO said at that time.  Correct?

3   A    Correct.

4   Q    Now you're aware of the fact that Consuelo Ramiz had been

5   telling people who were robbed or beaten in Mexico to always

6   tell police that Mr. Martinez did it.  correct?

7   A    No.  I have no idea on that.

8   Q    Really?  Let me show you Exhibit 7.  Let me show you

9   Exhibit 7.  Exhibit 7 is an FBI report of the debriefing of the

10  confidential informant.  correct?

11  A    Correct.

12  Q    All right.  And if we turn over to the very last paragraph

13  of that report, what we see is the agent reports that the

14  informant was aware of clients who had been robbed or kidnapped

15  in Mexico and they had been told by Ramiz to file police

16  reports claiming that the robbers told them they were acting on

17  behalf of Carlos Martinez when the clients didn't ever know who

18  Carlos Martinez was.  Right?

19  A    That's what the report says.

20  Q    So that was actually reported to an FBI agent who made a

21  part of his report that Consuelo Ramiz was going around trying

22  to get people to lie to the government to implicate Mr.

23  Martinez.  Correct?

24  A    I don't know why she would have stated that, whether it

25  was to lie or not.

```
1    Q    Why don't you answer my question?

2    A    I don't know.

3              THE COURT:  I mean, that's what the report says.

4    It's what it says.

5              MR. SCHAFFER:  Right.

6    By MR. SCHAFFER:

7    Q    And that's one of several reports filled out by your boss,

8    the FBI, as to interviews with informants.  Correct?

9    A    If you have the reports.

10   Q    No, you have it now.  Do you have any reason to doubt

11   what's in there?

12   A    Yes.  No, I don't.

13   Q    Okay.  So it was reported to the FBI three or four years

14   ago to be careful because Consuelo Ramiz is trying to get

15   people to lie about Mr. Martinez.  That's what it says.

16   Correct?

17   A    It's not a warning.  It just states the facts of what the

18   --

19             THE COURT:  Look, I get it.  I get it.  It's what it

20   says.  Next.  And I'll just -- I'm not trying to, you know,

21   make arguments but let's just not cloud things up, speaking of

22   clouds.  I mean, the problem is that the Defendant's iCloud

23   account has a discussion on it about removing the security

24   detail on September 27th, 2018, the very date that the beating

25   occurred.  Why don't you ask him about that?
```

```
 1              MR. SCHAFFER:  Okay.  I'll --

 2              THE COURT:  I mean, you know --

 3    BY MR. SCHAFFER:

 4    Q    Now what that message actually had to do with -- are you

 5    familiar with the place right across the border, an

 6    intersection known as the Y?

 7    A    Yes.  The Y has come up a few times.

 8    Q    Okay.  Let's talk about how it comes up.  If you cross the

 9    Mexican border and you go a couple miles inland, you come to an

10    intersection that actually looks like a Y.  correct?

11    A    I'm going to take your word for it.  I don't know.

12    Q    Have you ever been to the Y or seen pictures of the Y?

13    A    We don't cross over into Mexico as part of our official

14    duties.

15    Q    Yet you talk to informants who told about the Y.  correct?

16    A    Yes.  Informants have discussed the Y.

17    Q    Okay.  So you're aware of the fact that at some point, the

18    governor of Tamaulipus authorized his director of finance that

19    he could set up a roadblock at the Y and collect $100 off every

20    transmigrante that came through there.  Correct?

21    A    I'm not aware of that.

22    Q    You're aware of the fact that LG has a brother who has

23    actually -- worked for the Department of Finance over in

24    Tamaulipus.  Correct?

25    A    I'm not aware of that either.
```

1    Q    Let me have those reports.  It's number 25.  I'm going to

2    hand you what I'm marking as Exhibit 25.  I'm going to hand you

3    Exhibit 25 and ask you to take a look at it, familiarize

4    yourself with it, please.  Are you familiar with that report?

5    A    Yes, sir.

6    Q    Had you seen it before?

7    A    I believe so.  I believe it was one of the ones that I

8    have reviewed.

9    Q    Okay.  And the report is a Department of Homeland Security

10   report of a conversation with an informant.  Correct?

11   A    Source of information.  I believe the HSI clarifies SOIs

12   and informants in a different category but that's their --

13   Q    Well, there's somebody that's supplying information about

14   this case.  Correct?

15   A    Correct.

16   Q    And this was from -- this report is from October -- or

17   about an interview September 25th, 2019.  Correct?

18   A    Yes.

19   Q    And it talks about person LG that you all have been

20   discussing during the hearing today.  Correct?

21   A    Correct.  She's mentioned.

22   Q    And it talks how Arturo Soto Alamonde is the Tamaulipus

23   finance secretary that LG Soto Alamonde met with the United

24   States and made an agreement to charge 100 to $150 each or --

25   in a fee -- to pass along the Y in San Fernando, Tamaulipus.

1    The Y is a common reference to a location where the road splits

2    in the area.  The sources stated that the brother of Linda

3    Guerreo -- of LG -- is known as Rueben G. and may have assisted

4    in brokering the deal between Linda and -- LG -- and Soto

5    Alamonde.  The source believes this is true because Rueben

6    worked for all -- worked for or still works for the state of

7    Tamaulipus.  The source say that any transmigrant who did not

8    pay was stopped at the Y and harassed by the Tamaulipus tax

9    division until the $150 was paid.  That's the LG you've been

10   talking about as being such a great source of information.

11   Correct?

12   A    This is the same LG, yes.

13   Q    Okay.  And yet you're hearing from another source of

14   information that she actually has an extortion or shakedown

15   scheme she's doing with the state of Tamaulipus down at the Y.

16   Correct?

17   A    I believe this report states that the Tamaulipus tax

18   division was the one stopping people.

19   Q    Did I read that report incorrectly --

20            THE COURT:  Okay.  Just a minute.  I'm taking away

21   that LG is also a shaker downer and in cahoots with the

22   government of Mexico somehow.  Is that what you're trying to

23   convey to me?

24            MR. SCHAFFER:  That and she's trying to remove

25   competition that she has here in the United States, including -

```
 1    -
 2              THE COURT:  That's my takeaway.  I got it.
 3              MR. SCHAFFER:  -- including Mr. Martinez and all the
 4    other Defendants that she was competing against.
 5              THE COURT:  Okay.  I got it.
 6    BY MR. SCHAFFER:
 7    Q    So while LG is in the FBI and HSI office informing, she's
 8    also running a shakedown scheme over in Mexico.  Correct?
 9              THE COURT:  Who's the person being interviewed in
10    that report?
11              MR. SCHAFFER:  It just says source of information.
12              THE COURT:  All right.  It's not LG.
13              THE WITNESS:  No, Your Honor, it's not.
14              THE COURT:  Okay.  So it's some other person that's
15    telling us what that person believes about LG.  Right?
16              MR. SCHAFFER:  Yes, Your Honor.
17              THE COURT:  Okay.  Go.  Keep going.
18    BY MR. SCHAFFER:
19    Q    And part of the way that scheme worked is that LG's cars -
20    - transmigrante cars -- would have people escorting them
21    through the -- from the border all the way down through the Y.
22    Correct?
23    A    Yes.
24    Q    Okay.  And what happened was, somebody communicated with
25    Mr. Martinez that Reuben, LG's brother, had been fired by the
```

1  government and so there would be no more escorts of those cars

2  coming through there.  Correct?

3  A    I believe in the text thread, yes, it stated that Reuben

4  had been fired.

5  Q    Right.  And what happened is, Mr. Martinez and every other

6  owner of a (indiscernible) agency was complaining to the

7  Mexican government that LG was using the government to make

8  money off of these transmigrantes and -- which were being

9  handled by companies other than hers.  Correct?

10 A    I mean --

11 Q    That's what you heard.  Correct?

12 A    The report states that there was an agreement made between

13 these two people.

14 Q    And you're aware of the fact that Mr. Martinez and a

15 number of other forwarding agents started complaining to the

16 government and the media about what LG was doing in cahoots

17 with the Tamaulipus government.  Correct?

18 A    No, I'm not aware of any complaints made.

19 Q    All right.  There's also testimony on direct about the

20 kidnapping of AA and FC.  Do you recall that?

21 A    Yes.

22 Q    Do you have evidence to show that Mr. Martinez was

23 involved in that in any way at all?

24 A    No.

25          THE COURT:  Well, wait.  What did AA say?

```
 1              THE WITNESS:  At the end of the kidnapping, AA stated
 2   that her kidnapper said that she was kidnapped because of what
 3   her father did for work and that if her father didn't find a
 4   new job, he would disappear as well.
 5              THE COURT:  I mean, I get it that it's, you know --
 6   when you said, is not evidence, I just don't want to cloud the
 7   record as evidence.  You're talking about physical evidence or
 8   otherwise or seeing him at the scene or him being personally
 9   involved.  I get it, that there's not that evidence, but
10   there's a statement by AA that her kidnapper implicated Mr.
11   Martinez.
12              MR. SCHAFFER:  Okay.  See that's -- I'm glad you said
13   that.  That's not what happened --
14              THE COURT:  So --
15   BY MR. SCHAFFER:
16   Q    AA never talked about Carlos Martinez, did she?
17   A    She stated that she was told, this is because of what AA's
18   father did for work.
19   Q    So how does -- I mean, AA's father worked for a guy Luis
20   (indiscernible).  Correct?
21   A    Correct.
22   Q    He is a -- he's an organized crime figure down in Mexico,
23   isn't he?
24   A    I'm unaware of his status in Mexico.
25   Q    Are you aware of the fact that he was arrested smuggling
```

1   1400 bulletproof vests into Mexico?  He was arrested for

2   organized crime.  He was in prison for extortion.  You didn't

3   know any of that?

4   A    I know that he was arrested on tax charges and all the

5   charges against him were dropped.  I don't have his complete

6   criminal record from Mexico.

7   Q    Are you aware of the fact that he owns a paramilitary

8   group called group called Hercules?

9        THE COURT:  Okay.  We're starting to get off.  I'm

10  not worried about the AA thing.  I have no idea what happened.

11  Okay?  Just -- we're getting -- we're unpeeling the onion and

12  you guys are going to have a month-long trial and you've to

13  going to do it in front of me.  I want to know if I can let

14  this go.

15        MR. SCHAFFER:  Well, Your Honor, so --

16        THE COURT:  I got it.  I'm not going to listen to the

17  AA part of it because I don't know what happened.  So move on.

18  BY MR. SCHAFFER:

19  Q    All right.  Let's talk about the killing of Rocio Aldrete.

20  That's one of the things she testified about a little while

21  ago.  Let me have Exhibits 7, 11 (indiscernible).  You would

22  agree with me that in that 180-item index that I gave you

23  earlier -- in there somewhere --

24  A    Yes, sir.

25  Q    -- these are all the exhibits that you were supposed to

 1  review and testify about, there's not a word in there about Mr.

 2  Martinez being involved in the killing of Rocio Aldrete or the

 3  shooting of Consuelo Ramiz.  Correct?

 4  A    No, sir.

 5  Q    As a matter of fact, there are numerous reports from

 6  informants where they said how other people were involved in

 7  that shooting and not Mr. Martinez.  Correct?

 8  A    I'm unaware of that.

 9  Q    You're about to see them.  Let me have (indiscernible).

10           THE COURT:  Which thing are we talking about now?

11           MR. SCHAFFER:  The shooting -- where he talks about

12  two women being shot in Mexico -- Consuelo Ramos and Rocio

13  Aldrete.  That was the second act of --

14           THE COURT:  I just remember RH.  Is that the same

15  person?

16           MR. SCHAFFER:  (indiscernible) I think they meant RA.

17  It's Rocio Aldrete.

18           THE COURT:  All right.  I write down what I'm told so

19  is it -- now it's RA?  So on 3/7/19, Ramos goes to Mexico with

20  now RA which is her client.  They're both shot numerous times?

21           MR. SCHAFFER:  Well, they --

22           THE COURT:  Isn't that what his testimony was?

23  That's what we're -- that's the one we're talking about?

24           MR. SCHAFFER:  Yes, sir.

25           THE COURT:  I want to get to the one we're talking

 1    about and take notes next to it.  That's all I'm doing.

 2              MR. SCHAFFER:  No, I understand.

 3              THE COURT:  I just want to -- I'm going backwards in

 4    my notes.  Now I'm going to put a little line and say what

 5    you're going to say about it.  So go ahead.  That's all I'm

 6    doing.

 7    BY MR. SCHAFFER:

 8    Q    Let me show you Exhibit 11, the FBI report authored by

 9    Matthew (indiscernible).

10              THE COURT:  Is there any information in your

11    investigative file that Mr. Martinez had anything to do with

12    the 3/17/19 shooting?  Is there?

13              THE WITNESS:  Not directly, Your Honor, no.

14              THE COURT:  Is there indirectly?

15              THE WITNESS:  No.

16              THE COURT:  Okay.  So cross that one out.

17              MR. SCHAFFER:  I'll move on.

18              THE COURT:  Okay.  I got to -- I crossed it out.  I'm

19    not going to worry about it.

20    BY MR. SCHAFFER:

21    Q    All right.  Then you talked about LG, and you said that

22    she had a brother who was shot 11/27/19 in Mexico.  Do you

23    recall that, sir?

24    A    A nephew.

25    Q    I'm sorry?

1    A    The nephew was shot.

2    Q    Oh, I thought it was on --

3    A    The brother, OG, was shot at.

4    Q    Oh, okay.  Now OG and his companion were both interviewed

5    by police.  Correct?

6    A    Yes, they gave a statement.

7    Q    Neither of them implicated Carlos Martinez

8    (indiscernible).

9    A    No.

10   Q    On the -- oh, in fact, OG was asked specifically if his

11   shooting was cartel related and he said no.  Correct?

12   A    If that's what he said.  I don't have memorized what he

13   stated.

14   Q    Okay.  All right.  So let's talk about LG.  You said the

15   first incident, 10/24/19, there was a fire bombing of a vehicle

16   over in Mexico.  Correct?

17   A    Correct.

18   Q    Tell me if the evidence you have that suggests that Carlos

19   Martinez was responsible for that.

20   A    There's no evidence.

21   Q    11/6/19, there was a shooting -- LG's nephew and two other

22   individuals.  What evidence do you have to show that my client

23   is connected to that?

24   A    Nothing directly.

25   Q    11/17/19, is that -- yeah, that's the shooting of --

1    somebody shooting at them.  Correct?

2    A    I believe so, yes.

3    Q    We've already talked about that.  Now here's the

4    interesting thing about LG.  What you talked about earlier

5    called the pool -- supposedly -- well, the pool in 2019 no

6    longer existed.  Correct?

7    A    The status of the pool and the members of the pool

8    fluctuated.  I don't have a timeline on who was in it and when

9    they were and were not in it.

10   Q    Do you recall -- and by the way, LG had initially come in

11   to complain about threats being made toward her in the

12   transmigrante business as early as 2013.  Correct?

13   A    I believe so.  I don't have that date.

14           MR. SCHAFFER:  Your Honor, I'm going to have very,

15   very few questions left.  Could we take a very quick break so I

16   can kind of streamline?  I'm throwing out over half of what I

17   was going to (indiscernible).

18           THE COURT:  All right.  How long so you need?

19           MR. SCHAFFER:  Five, ten minutes.

20           THE COURT:  Anything before I go?  Are we --

21           MS. TAYLOR:  No, Your Honor.

22           THE COURT:  How are you going to be on redirect?

23           MS. TAYLOR:  Brief if at all.

24           THE COURT:  All right.  And what are you going to be

25   doing?

```
 1              MR. SCHAFFER:  We're going to call one witness.
 2    We're going to proffer a few but not many.  And then we might
 3    have one additional witness who will take like one minute.  I
 4    would think our whole presentation will take less than 15
 5    minutes.
 6              THE COURT:  All right.  Because remember, I have a
 7    phone call and I want to be respectful of everybody with their
 8    time and they're just going to be sitting there.  So if we're
 9    not done by 4:30 (indiscernible)
10              MR. SCHAFFER:  We'll be very close.  I think we can
11    do it.
12              THE COURT:  All right.  So I'll come back
13    (indiscernible).
14              (Recess)
15              THE COURT:  All right, we're back on the record.  Mr.
16    Schaffer, go ahead.
17              MR. SCHAFFER:  Yes, Your Honor.
18        RESUMED CROSS EXAMINATION OF SPECIAL AGENT BRYAN ENGEL
19    BY MR. SCHAFFER:
20    Q    I'm going to show you what's marked as Exhibit 22.  This
21    is a Homeland Security investigation report, correct?
22    A    Yes, it is.
23    Q    And in there, the agent by the name of Sergio Velasquez
24    reports an interview with a person named L.G., correct?
25    A    Correct.
```

1   Q    That's the same L.G. you've been testifying about today,

2   correct?

3   A    Correct.

4   Q    Then L.G. went to the government, May 19th of 2013, to say

5   that she was being threatened by Miguel Caballero in the

6   transmigrante business, correct?

7   A    Correct.

8   Q    Okay.  And she started providing information then about

9   Mr. Caballero and his association with the Gulf Cartel,

10  correct?

11  A    Yes, she's talking about Mr. Caballero.

12  Q    Okay.  And he was in competition with her, correct?

13  A    Yes, he ran another transmigrante forwarding agency.

14  Q    And he's one of the defendants in this case, right?

15  A    He is.

16  Q    So basically you have somebody, the woman who was running

17  the shakedown at the Y as early as 2013 reporting on the

18  threats and allegations against (sound drops), right?

19  A    She made reports on Mr. Caballero, yes.

20  Q    Okay.  Now, at the time of that interview, L.G. was not a

21  government informant, correct?

22  A    I have no knowledge of that.  I'm not sure.

23  Q    (Indiscernible)

24  A    Correct.

25  Q    Okay.  Then later on if we read through all these reports,

1    she becomes a source of information, and then later on a

2    confidential human source, correct?

3              MS. TAYLOR:  Objection, Your Honor.

4              THE COURT:  What's the objection?

5              MS. TAYLOR:  Relevance whether she's a source and not

6    information we want to reveal publicly at this juncture.

7              THE COURT:  All right.  I mean, but she developed

8    into somebody who's now talking to the FBI in terms of trying

9    to implicate Mr. Martinez, right?

10             MS. TAYLOR:  Correct.

11             THE WITNESS:  She is not working with the FBI, Your

12   Honor.  She's working -- she was speaking with HSI in this

13   report.

14             THE COURT:  Okay, whoever, yes.

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  But she's speaking with agents, I got it.

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  I don't think it matters her capacity.

19             MR. SCHAFFER:  Okay, all right.

20   BY MR. SCHAFFER:

21   Q    The reason I ask about this, sir, is later on in 2018,

22   this L.G., she actually started calling around -- I'm going to

23   give you Exhibit 23 -- and talking to other people telling

24   them, hey, we have to get that pool going again.  Do you recall

25   that, sir?  And in particular, back on January 7th of 2018, you

1    recall L.G. calling Sandra, the team, and Marco -- all co-

2    defendants in this case -- saying, hey, we got to get the pool

3    back together so we can make some money.

4    A    I do not, no.

5    Q    I want you to refer to Exhibit 23 that I just gave you.

6    A    Yes, sir.

7    Q    Have you read that report?  In particular, let me refer

8    you to Page 3.  Do you see that this informant, SA115HG, which

9    is the Homeland Security informant, is telling the other co-

10   defendants in this case, Marco Medina in particular, that they

11   need to get back together, work out the issues, and we need to

12   do it before it gets too cold because it's going to be

13   different -- harder to push forward.  Do you see the part I'm

14   referencing?

15   A    I see that in the report, yes.

16   Q    Now, have you listened to that tape recording?

17   A    No, I have not.

18   Q    Are you aware that L.G. instructs three of the individuals

19   in this indictment that we need to put the pool back together

20   and we need to do it quick.

21   A    No, I'm not.

22   Q    You're aware of the fact that that conversation is tape

23   recorded, correct?

24   A    I am now if you're telling me it is.  I've never heard

25   the...

1  Q    Have you ever seen this report that I just put in front of

2  you?

3  A    No, sir.  We don't make it a practice of handing out

4  informant reports to other agencies.

5  Q    You'd agree with me it wouldn't be proper for a government

6  informant to be encouraging people to get together and break

7  the law, correct?

8  A    I cannot discuss or have any knowledge of what she was

9  doing for Homeland.  I have no idea.

10  Q    You're saying in theory, it would not be crime, correct?

11  A    That depends on the status of her as a source.

12  Q    I think I need to ask you any other questions about that.

13  You're aware of the fact, you testified about a conversation

14  that took place at a restaurant that was being tape recorded by

15  L.G..  Let me find the specific part.  You said that December

16  12, 2019, Ceballos, one of the co-defendants, had a meeting

17  with Linda about her paying a fine, correct?

18  A    Correct.

19  Q    You recall -- by the way, you have her exact conversation,

20  correct?

21  A    The audio recordings are mostly in Spanish.

22  Q    Did you read the transcript?

23  A    I've read some of the transcript.

24  Q    Okay.  And you recall that Mr. Ceballos was saying that he

25  had talked to Carlos Martinez's brother, and Mr. Martinez's

 1    brother was saying Carlos is very upset because people are out

 2    robbing and killing people and using his name trying to put it

 3    all off on him.

 4    A     No, sir.  I'm unaware of that part.

 5    Q     You didn't read that part of the transcript.

 6    A     I did not read the entire transcript, sir.

 7    Q     Let me show you what we have marked as Exhibit -- by the

 8    way, that meeting took place over four years ago, correct?

 9    A     I believe so.

10    Q     I'm going to show you what I've marked as Exhibit 20.  Is

11    this the report that you reviewed concerning the meeting

12    between Ceballos and L.G. December 20, 2019?

13    A     I did not review this report.  I had the actual, like,

14    stack of the translations, which...

15    Q     I'm going to direct your attention to Page 7 at the very

16    top of the page.

17              THE COURT:  What are y'all talking about?  Tell me

18    what you're -- I've lost track of your question.

19              MR. SCHAFFER:  All right.  So what this has to do

20    with, he said there was a meeting that took place between

21    Ceballos and Linda Guerrero.

22              THE COURT:  Are we supposed to be using the letters?

23              MR. SCHAFFER:  I'm sorry?

24              THE COURT:  Aren't we supposed to be just using the

25    letters?

```
 1                    MR. SCHAFFER:  I'm sorry, L.G.  Well, some of them...
 2                    THE COURT:  I know.  Just use the letters so that --
 3       please.
 4                    MR. SCHAFFER:  Anyway, he said there's a meeting
 5       between L.G. and Ceballos where Ceballos told her she was going
 6       to have to pay a fine and that this money --
 7                    THE COURT:  What's the date of this meeting because I
 8       have them all written down by date.
 9                    MR. SCHAFFER:  This is December 12, 2019.
10                    THE COURT:  What's the question you have about it?
11                    MR. SCHAFFER:  Well, so the point is it was during
12       this meeting when Mr. Ceballos is saying that he had talked to
13       Jorge, who's Mr. Martinez's brother, correct?
14                    THE COURT:  Is Jorge Mr. Ceballos -- who's brother --
15       ask the question again.
16       BY MR. SCHAFFER:
17       Q    Do you know if Mr. Martinez has a brother named Jorge?
18       A    Yes.
19       Q    Okay.  And what Mr. Ceballos is saying is that he had
20       talked to Jorge.  Mr. Martinez -- Carlos Martinez -- is upset
21       because they're robbing and killing and using my name and
22       that's wrong.  The very top passage at the top of Page 7.
23       A    That's what the report says.
24       Q    Okay.  And that starts with Mr. Ceballos is talking about
25       to Linda -- L.G. -- that he's upset with people using his name
```

1    while they're out committing crimes, correct?

2    A    That's what it would indicate that Mr. Ceballos --

3    Q    And that brings me to the person named L.B.

4          THE COURT:  Wait, can we just go back though?  I just

5    -- I don't want to lose track here.  So I had understood that

6    in that meeting, Ceballos-Soto meets with L.G., right?  Yes?

7          THE WITNESS:  Yes, Your Honor.

8          THE COURT:  And Ceballos-Soto says to L.G. that he's

9    working for Martinez, correct?

10         THE WITNESS:  Correct.

11         THE COURT:  Ceballos-Soto tells L.G. she's not in

12   compliance with the pool or the peso and the fines and all

13   that, correct?

14         THE WITNESS:  Yes, Your Honor, that's the meeting

15   where she paid the fines.

16         THE COURT:  And Ceballos-Soto says that Martinez was

17   requiring the fees.

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.  Now what's the context in which

20   Martinez says that he doesn't like people using his name that

21   you just testified about; what's the context of that?

22         THE WITNESS:  In this report, Your Honor, it's just a

23   number of individuals talking line by line and it was one of

24   the comments made by Ceballos-Soto is that he does not like

25   Luis, nor Julio, and that he -- Jorge, Mr. Martinez's brother

 1   -- said that -- let him, Quanta, find out.  If you check, it is

 2   clean.  The roaches are running.  They were robbing and killing

 3   using my name -- Quanta's name -- and that is wrong.

 4              THE COURT:  Okay.

 5   BY MR. SCHAFFER:

 6   Q    So but what Mr. Ceballos is doing during that meeting with

 7   L.G. is he's saying, oh yeah, you got to pay $50,000 or $42,000

 8   because this is going to go to the fine, correct?

 9   A    That was her fine for the patentee, yes.

10   Q    Right.  But that money didn't go to Quanta; that money

11   went to Mr. Ceballos, the person who was sitting there saying,

12   oh yeah, you got to pay this $42,000, correct?

13   A    Mr. Ceballos worked on behalf of Mr. Martinez.

14              THE COURT:  But, yes, it got paid to Ceballos.  You

15   don't know if he paid it to Martinez, do you?

16              THE WITNESS:  Both of the fine payments actually went

17   to Yzaguirre, who is a money courier for Martinez.

18   BY MR. SCHAFFER:

19   Q    But you don't know what Mr. Yzaguirre did with that money,

20   did you?

21   A    I do not.

22   Q    So the last thing I'm going to talk to you about -- oh,

23   and by the way, you're aware of the fact that Mr. Martinez,

24   Carlos Martinez, did not even get involved in the transmigrante

25   business until 2016, correct?

1  A    The reports that I have read indicated that he started to

2  participate in the industry in 2013, but that later, like in

3  the 2016-'17 era, was making decisions with Marco Medina

4  running his transmigrante forwarding agency for him.

5  Q    So you're telling me there's a government report that says

6  Mr. Martinez was in the business in 2013?

7  A    I can't specifically remember which one, but in

8  discussions with case agents who have been on this case much

9  longer than I have, that is what was relayed to me, yes.

10  Q    Can you think of a reason in the world why that hasn't

11  been turned over to us?

12  A    There's a lot that's been turned over.  I have no idea.

13  Q    So one of the people you testified about and asked a few

14  questions have to do with this guy named L.B., and that's the

15  one that I ask you about the fact that he was in prison for

16  organized crime and extortion and smuggling.  That's the person

17  that you said that back in 2013, OCL Carlos Jr. and Mr.

18  Martinez had kidnapped, right?

19  A    In 2012.

20  Q    2012, same person, L.B., correct?

21  A    Correct, based on his reporting.

22  Q    Right.  And L.B. was saying in essence I was kidnapped,

23  tied up, hood put over my head, but I could see through the

24  fabric and I could tell it was Carlos Martinez.

25  A    Correct.

1    Q    And then five or six years later, Carlos Martinez came to

2    him and said, hey, I want to work together, correct?

3    A    It didn't sound like it was that peaceful of a

4    conversation, but yes.

5    Q    Of course, in 2017 when that supposedly happened, that's

6    when Mr. L.B. was in prison in Mexico, correct?

7    A    I'm not sure when he was incarcerated in Mexico.

8    Q    As a matter of fact, when you interviewed Consuelo, she

9    said that she was only running Mr. L.B.'s business because he

10   was locked up in prison, and so she was running the business

11   until he gets out.

12   A    That's correct.

13   Q    That's in the report, correct?

14   A    In 2018-'19, I believe.

15   Q    Sorry?

16   A    Like, I believe that was in the 2018-'19 timeframe, yes.

17   Q    He was in prison 2018 to 2019?

18   A    I'm not sure of his incarceration.  I believe that's what

19   the report states as far as her timeline when she was running

20   the transmigrante agency.

21   Q    Do you know why he was in prison?

22             THE COURT:  Can I just comment that this --

23             MR. SCHAFFER:  I'm sorry?

24             THE COURT:  I'm just going to comment that -- with

25   apologies to any district judge who has to read this transcript

```
 1    later -- y'all are talking over each other so much.  Because
 2    what happens, whether you know it or not, is she's not actually
 3    going to transcribe this.  She's just making a recording.  It
 4    gets sent to some person across town who's going to be sitting
 5    there trying to recognize voices and doing a transcription and
 6    this transcription is going to say question inaudible, answer
 7    inaudible, question inaudible, answer inaudible.  It's going to
 8    be a mess.  Please don't talk over each other.  I'm just giving
 9    you a fair warning that that's what we keep getting back with
10    these ERO transcripts.  It's not perfect.
11              MR. SCHAFFER:  Yes, sir.
12              THE WITNESS:  Yes, Your Honor.
13    BY MR. SCHAFFER:
14    Q    You're aware of what L.B. was in prison for the two or
15    three times that he went, correct?
16    A    I am aware, based on his interview, that he was imprisoned
17    for a certain amount of time -- I don't know the dates -- on
18    some type of tax law, but that the charges were later dropped.
19    I'm not sure of his entire criminal history, what he was in
20    prison for.
21    Q    Smuggling 1400 bulletproof vests into Mexico from the
22    United States, you weren't aware of that?
23    A    No idea.
24    Q    You're aware of the fact that he was under investigation
25    for murder and complicity in the murder of four American kids
```

1    who were kidnapped in a restaurant in Mexico, executed, and

2    their truck was found in his parking lot?

3    A    No, I'm not.

4    Q    You never knew that.

5    A    No, sir.

6         MS. TAYLOR:  Objection, Your Honor.  Asked and

7    answered.

8         THE COURT:  Sustained.

9         MR. SCHAFFER:  I'll pass the witness, Your Honor.

10        THE COURT:  Redirect?

11        MS. TAYLOR:  No further questions, Your Honor.

12        THE COURT:  You can step down; stay in the courtroom

13   though.  I know it's crowded, so maybe you can sit over next to

14   the marshal or something like that?

15        THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Any other witnesses or evidence from the

17   government?

18        MS. TAYLOR:  No, Your Honor, the government will

19   rest.

20        THE COURT:  All right.  Do you have witnesses or a

21   proffer in any order that you choose?

22        MR. KENNEDY:  I'd like to call Joel Garza to the

23   stand, please.

24        THE COURT:  Be sworn, please.

25        CLERK:  Raise your right hand.  Do you solemnly swear

```
1    the testimony you will give in the case now before the Court is

2    the truth, the whole truth, and nothing but the truth, so help

3    you God?

4              MR. GARZA:  Yes, I do.

5              MR. KENNEDY:  May I proceed, Your Honor?

6              THE COURT:  Yes.

7                    DIRECT EXAMINATION OF JOEL GARZA

8    BY MR. KENNEDY:

9    Q    Would you please state your name for the Court and for the

10   record.

11   A    I'm Joel Garza.

12   Q    How old are you, sir?

13   A    67.

14   Q    Where do you currently reside?

15   A    Tomball.  The address?

16   Q    No, sir, that's fine.  Who do you live with?

17   A    My wife, my son.

18   Q    How are you related to Mr. Martinez?

19   A    He's my nephew.

20   Q    All right.  Explain the relationship to the Judge quickly

21   of the familial relationship with you and Mr. Martinez.

22   A    Well, they used to live in Houston.  He was born here in

23   Houston, him and his brother are twins, so I went to hospital

24   and met them when they were born, the day they were born, and

25   they've been here with us off and on.
```

1    Q    Okay.  How many brothers and sisters do you have?

2    A    I have four sisters and five brothers -- actually, six

3    brothers, but one passed away.

4    Q    So you consider yourself a large family?

5    A    Yes, sir, about a hundred and something right now.

6    Q    Okay.  Well clearly, they're not all here, but most of

7    these people are from the Houston area and from the Rio Grande

8    Valley; is that correct?

9    A    Correct.

10   Q    And, in fact, this is their third time all of them coming

11   to Houston for this detention hearing; is that correct?

12   A    Correct.

13   Q    We've lost a few, we've gained a few along the way,

14   correct?

15   A    Yes, sir.

16   Q    Mr. Martinez lived with you for a while; is that correct?

17   A    Yes.  When they came to school, we came over here and went

18   to school for a while.

19   Q    Okay.  You were interviewed by pretrial services; is that

20   correct, sir?

21   A    Yes, sir.

22   Q    In particular about being a third-party custodian.

23   A    Correct.

24   Q    And they explained that responsibility to you, sir?

25   A    Yes.

```
 1   Q    And if you could explain to Judge Bray kind of what is
 2   your understanding about being a third-party custodian if he
 3   were to appoint you.
 4   A    Well, I'd be responsible for Mr. Martinez being home,
 5   following the rules and regulations that are set forth to him,
 6   and if he does something, I have to report to the government.
 7   Q    You'd have to turn him in.
 8   A    Yes.
 9   Q    Okay.  And that's a responsibility that you're willing to
10   take on; is that correct?
11   A    Correct.
12   Q    How are you currently employed?
13   A    I work for a manufacturing company that builds equipment
14   for drilling for oil.  I'm in the engineering department.
15   Q    How long have you been employed in that field?
16   A    31 years.
17   Q    Okay.  And what does your workweek look like; how often
18   are you home, how often are you at work?
19   A    I work three days in the office and two days at home.
20   Q    Okay.  So it's fair to say four days out of the week,
21   you're actually at the house.
22   A    I'm home, correct.
23   Q    So if you were appointed as a third-party custodian, four
24   days out of the week, you're actually there all day.
25   A    I would be there at home.
```

1    Q    And your wife was also interviewed by pretrial services;

2    is that correct?

3    A    Correct.

4    Q    Is she at home all the time or does she work?

5    A    No, she's at home.

6    Q    So when you're not home, your wife is home all the time.

7    A    My wife is home, yes.

8    Q    Explain for the judge your house, the description of your

9    home so that Judge Bray would understand that if you were the

10   third-party custodian where Mr. Martinez would actually be

11   living if he was confined to your home.

12   A    It's basically a four-bedroom home and it's got two

13   bedrooms, three bedrooms upstairs; they each got their own

14   bathroom.  And it's all connected -- garage, game room, and

15   where our bedroom is downstairs, and living room and game room

16   -- I'm sorry -- and my office area and dining room.

17   Q    Okay.  So if pretrial services were to come and do

18   surprise visits at your home, you would take no issue with

19   that?

20   A    Not at all.

21   Q    You would welcome that actually.

22   A    Sure.

23   Q    You understand we've discussed that the United States

24   probation office is recommending release in this case, correct?

25   A    Correct.

1    Q    And that they're recommending a $100,000 secured bond

2    signed by you.

3    A    Correct.

4    Q    They believe you're a suitable cosigner; do you

5    understand?

6    A    Yes.

7    Q    Are you aware that there are other family -- are there

8    other family members willing to cosign as well?

9    A    I believe so, yes.

10   Q    All right.  Pretrial services has recommended that Mr.

11   Martinez be supervised by their office while he's on bond.  Do

12   you believe Mr. Martinez would abide by that condition?

13   A    Yes.

14   Q    Okay.  They are recommending that Mr. Martinez maintain

15   and actively seek employment.  Do you believe that he would

16   abide by that condition if released?

17   A    Yes.

18   Q    If the Judge were to put limitations on Mr. Martinez's

19   employment, let's say not participate in a certain type of

20   business or certain type of activity, do you believe Mr.

21   Martinez would abide by Judge Bray's condition?

22   A    Yes, he would.

23   Q    In particular, if Judge Bray ordered that he not be

24   involved with anybody related to the transmigrante industry,

25   anybody involved in this case, any witnesses or codefendants,

1    do you believe he would abide by Judge Bray's condition?

2    A    He would, I would say so.

3    Q    You're aware that we have his passport here today ready to

4    surrender it, correct, sir?

5    A    Yes, correct.

6    Q    And pretrial services are recommending that his travel be

7    restricted to the state of Texas.  Would he abide by that

8    condition?

9    A    Yes, he would.

10   Q    And do you believe that if Judge Bray were to confine that

11   even more, that he be restricted to the Houston area and

12   surrounding counties, that Mr. Martinez would abide by that

13   condition?

14   A    Yes, he would.

15   Q    Pretrial services recommended that he avoid all contact

16   with codefendants, witnesses, victims, or potential victims.

17   Do you believe that Mr. Martinez would follow that condition

18   that's recommended?

19   A    Yes, he would.

20   Q    He must refrain from possessing firearms.  Do you think he

21   would abide by that?

22   A    Yes, he would.

23   Q    Do you have firearms in your home?

24   A    Yes, I do.

25   Q    How many?

1   A     One.

2   Q     If Mr. Martinez were to be released today, by the time he

3   got home, could you have that one firearm removed from the

4   home?

5   A     Yes, I would.

6   Q     Okay.  And you understand you cannot have any firearms at

7   the home while he would be residing at your house.

8   A     Correct.

9   Q     Okay.  And that he not drink excessively; you understand

10  that?

11  A     Yes.

12  Q     Do you have an opinion, sir, whether or not Mr. Martinez

13  is a flight risk, that if he were to be released from the court

14  from confinement, that he would flee the jurisdiction and run

15  away?

16  A     No, I don't -- he would not flee.  I've known him for a

17  long time.  He's a contact person.  He's not -- I don't know

18  how to say this, but he wouldn't be anxious to go somewhere.

19  He would just abide by the laws.

20  Q     I mean, clearly, this is his support network here today.

21  A     Part of it, yes.

22  Q     Part of it.  But exactly, he has a much larger support

23  network and his ties to the community are very, very deep.

24  A     Right.

25  Q     If Judge Bray were to order that there be multiple

1    cosigners, let's say on this, not just you, do you believe that

2    there are family members here today that would be willing to do

3    that if the Court ordered it?

4    A    Yes, there are.

5    Q    Okay.  Do you have an opinion about whether or not Mr.

6    Martinez would be a danger to the community if he were to be

7    released on bond under certain conditions?

8    A    No, he would not be a danger to anyone.

9    Q    And it's your belief that Judge Bray actually could set

10   certain conditions or a combination of conditions that would

11   ensure the safety of the community.

12   A    Yes.

13   Q    Okay.  If Judge Bray were to restrict his use of

14   technology, his use of the internet, his use of cellphones that

15   have internet capability, would you be willing to remove

16   devices from your home actually that would prevent him from

17   having access to the internet?

18   A    Sure, I would.

19   Q    Okay.  So any condition that Judge Bray were to impose

20   would have restrictions on you, you would be willing to do that

21   for Mr. Martinez.

22   A    I would.

23   Q    And your wife, I'm not going to call her, but is it your

24   understanding that you've discussed this potential

25   responsibility with your wife.

```
1    A    Yes.

2    Q    Is she present here today?

3    A    Yes, she is.

4    Q    Okay.  She was interviewed by pretrial services as well?

5    A    Correct.

6    Q    And she would also be willing to cosign on a bond.

7    A    Yes.

8    Q    Okay.  You've heard the evidence here today.

9    A    Yes.

10   Q    Some of that was new, some of that was old, correct?

11   A    Right.

12   Q    And given what you've heard today, you're still willing to

13   be a third-party custodian and cosign on a bond for your

14   nephew.

15   A    Yes, sir.

16            MR. KENNEDY:  Thank you.  I have no further

17   questions.

18            THE COURT:  Cross.

19            MS. TAYLOR:  No, Your Honor.

20            THE COURT:  All right.  You can step down.  Thank

21   you.

22            THE WITNESS:  Yes, sir.

23            THE COURT:  What else?

24            MR. KENNEDY:  I have proffers.

25            THE COURT:  Okay.
```

```
 1              MR. KENNEDY:  His aunt, Nettie Garza, is here today.
 2   She's a 67-year-old United States citizen.  She was born and
 3   raised in Houston, Texas.  Been married 42 years, she has two
 4   boys, three grandkids.  She's a property owner, lives in
 5   Tomball.  You just heard from her husband.  She is willing to
 6   act as a third-party custodian as well.  She has been
 7   interviewed by pretrial services who believes she is suitable
 8   to be a third-party custodian, as well as a cosigner.  She
 9   would testify that in her opinion, Mr. Martinez is not a flight
10   risk, is not a danger to the community, and you could impose
11   conditions today that would ensure the safety of the community.
12              Mrs. Suzanna Quintanilla is his cousin.  She's
13   present.  She's 47 years old.  She has no criminal history.
14   She was born in Houston, raised in Houston, and married 27
15   years.  She has a 24-year-old son and a 13-year-old daughter.
16   She's first cousins to Mr. Martinez; they have a close
17   relationship.  She's a licensed insurance agent who also stays
18   at home working from home.  She has some property that she'd be
19   willing to cosign as well.  She would testify to the Court that
20   in her opinion, Mr. Martinez is not a flight risk and he would
21   not pose a danger to the community under your conditions.
22              Maria Quintanilla is present today.  She submitted a
23   letter to the Court.  I will not proffer her testimony, but
24   she's here today.
25              Patricia Sepulveda is his cousin, 49 years old, no
```

```
1    criminal history, born and raised in Houston; now she's living
2    down in McAllen, Texas.  She's been married for 28 years, she
3    has three children, she is a first cousin to Carlos.  She's
4    current working with her husband, who owns an automotive shop.
5    They own a home.  They'd be willing to cosign on a bond, so now
6    we have four cosigners.
7            Alma Morales, I believe she's outside with a baby.
8    She filed a letter with the Court stating her position about
9    his release.
10           Jose Miguel Acuna filed a letter as well.  What was
11   not stated in the letter is that he's willing to act as a
12   cosigner on the bond if the Court were to want more cosigners
13   or the Court would consider a larger secured bond that might be
14   -- other cosigners might be necessary.
15           Susanna Baez, she's willing to be a cosigner.  She's
16   40 years old, born in Houston, raised in Progresso.  She's been
17   married 18 years and has two children.  She spends a lot of
18   time with Carlos and his family.  They go on vacation; they go
19   to dinners together.  She's very, very close to him because of
20   their kids.  She is here to testify about his support network
21   and that, in her opinion, he would not pose a flight risk or a
22   danger to the community.
23           Sheila Lozano filed a letter with the Court stating
24   her position.  She is also willing to be a cosigner.
25           Armado Gutierrez, that his first cousin, 47 years
```

1    old, no criminal history, born in California, raised in Texas,

2    currently lives here in Houston, been married 15 years and has

3    three kids.  He sees and speaks to Carlos often.  He's been a

4    sales representative for an equipment company for 20 years.  He

5    lives in a home that he owns with his wife and kids.  He's

6    willing to be a cosigner for his cousin today.

7         Leticia Gutierrez, that's his first cousin, 49 years

8    old, no criminal history.  She lives in Houston.  She's

9    currently divorced but has two kids, one who lives with her.

10   She was in the banking and securities industry, then she moved

11   into an environmental company.  She currently holds a position

12   with a non-profit doing community outreach.  She would testify

13   that, in her opinion, Mr. Martinez does not pose a flight risk

14   or a danger to the community.

15        Jesus Sines, 37 years old, no criminal history, born

16   and raised in Brownsville, married for seven years with two

17   kids.  He's known Mr. Martinez for years, had worked with his

18   brother, and before that, he was in the banking business.  He's

19   willing to be a cosigner today.

20        Juan Elizondo, 38 years old, no criminal history,

21   born and raised in Brownsville.  He's in the import/export

22   business in epoxy.  Owns a home, willing to act as a cosigner.

23        Finally, Juan Bohorquez, 38 years old, no criminal

24   history, born and raised in Brownsville, married nine years

25   with a 6-year-old daughter, currently employed as a logistics

1    manager.  He too would be willing to cosign on a bond if needed

2    and to be interviewed by pretrial services.

3           Present as well, but I'm not going to proffer just to

4    the Court knows: Sergio Solis filed a letter with the Court,

5    present today, Linda Sanchez, Irma Gonzalez, Laura Gonzalez,

6    Juan Cantu, Ian Rice, Sheila Lozano.  There are present and

7    filed letters with the Court.

8           In addition, his mother, his brother, his wife are

9    here today, in addition to six other friends who made the trek

10   willing to show support and be interviewed by pretrial services

11   if necessary.  That's our proffer.

12          MR. SCHAFFER:  I do have one additional -- excuse me

13   -- one issue (indiscernible).

14          So as you can see from one of the reports that we

15   just entered, the very last one, this investigation did not

16   start in 2018, it started in 2011.  It is reflected in the

17   report that the agent testified.  And it had to do with reports

18   that transmigrante forwarding agencies were engaging in

19   monopolistic behavior, which they have an actual contract

20   drafted that all four of them signed off on.  My client was not

21   involved in this until five or six years later.

22          The codefendants indicated to them it's not

23   antitrust.  They all talked to government agents and said we

24   just kept undercutting each other constantly to the point we

25   were going broke.  So we just all sat down and said, look,

1    let's quit doing that, charge the same thing, and that's it;

2    they drafted an agreement.  This isn't Coke versus Pepsi or

3    United versus Delta.  These were just four or five companies

4    that wanted to quit fighting among themselves, so they drafted

5    an agreement.  Six years later or five years later, my guy gets

6    involved.

7         But the important thing that I'm going to proffer to

8    you is this did start in 2011.  It continued until 2014 or

9    2015.  And Linda Guerrero is one of the first people to tell

10   (indiscernible) one of the first people that came in and

11   complained that she's being threatened by Mr. Caballero.

12        The investigation goes nowhere, it dies down.  It

13   gets rekindled when she comes back -- she and a few others --

14   five years later or three years later to try to get it going

15   again.  She's the person that we introduced testimony about for

16   running a shakedown scam, along with the guy from the Matamoros

17   government, who's her brother, to get $100 and $150 (sound

18   drops).

19        So that's the proffer we would make about the time

20   when the investigation actually started when this agent

21   testified he didn't know when it started.

22        So that's all the evidence we have and we rest, Your

23   Honor.

24        THE COURT:  All right.  Let me go and do this civil

25   matter for 10 minutes and then I'll hear argument and we'll do

```
1    a ruling, okay?  Just stay here because I'm just going to come

2    in as soon as I'm ready.

3         (Recess)

4              THE COURT:  We're back on the record.

5              CLERK:  All rise.

6              THE COURT:  Be seated, everyone.  The government's

7    argument.

8              MS. TAYLOR:  Thank you, Your Honor.  Your Honor, the

9    government is requesting continued detention of Mr. Martinez

10   pending trial based upon dangerousness to the community and

11   that he poses a flight risk.  And we do not believe the

12   conditions or any conditions -- the conditions recommended by

13   pretrial services or any other condition can fully compensate

14   for the dangerousness and the risk of flight.

15              Your Honor, you heard about two incidents in 2012

16   with L.B. where he reported he was beaten and actually saw Mr.

17   Martinez beating him, and then another incident in 2017 where

18   L.B. indicated that Martinez threatened him again.

19              Your Honor, Mr. Martinez is charged with conspiracy

20   to commit extorsion.  And by evidence collected in this

21   investigation, investigators have determined that he was

22   running this transmigrante scheme, and when people did not

23   comply with the rules and regulations of this scheme, he was

24   the one that decided who should be punished and would issue

25   those orders for violence to happen, and we see that in the
```

1    cases of C.R. and L.G.  When they were not in compliance with

2    the rules and regulations of the transmigrante industry, a

3    string of violence befell them, their clients, and their family

4    members.

5           In both cases of L.G. and R.C., this violence ceased.

6    In R.C.'s case where she stopped doing business in the

7    transmigrante industry, and in L.G.'s case when she came into

8    compliance, paid the fines that were ordered by Martinez and

9    then began operating under the rules and the peso requirements.

10   Specifically, compelling of this is Exhibit 9, which has been

11   received into evidence, which contains a picture that L.G. has

12   advised investigators was written up at her meeting with

13   Ceballos-Soto with exactly how much she was going to owe in

14   back pay of extortion payments and fines.  This image was found

15   on Mr. Martinez's iCloud and I do think this is some evidence

16   that does directly link him to these acts of violence that are

17   occurring.

18          Your Honor, in addition to the concern that we have

19   with the testimony that was provided, this is a case that

20   involves multiple defendants and, as you heard, many of them

21   are out in the community.  And additionally, it involves

22   multiple victims and witnesses who are out in the community and

23   we do have a concern, based on the allegations in this case,

24   based on the information that you've heard testimony today,

25   that Mr. Martinez poses a risk if he is released into the

1    community.

2            In addition to that, Your Honor, the government feels

3    that he is a flight risk.  You've heard testimony today that he

4    has extensive wealth, properties located both in the United

5    States and outside of the United States.  He has foreign

6    businesses, foreign bank accounts, and many ties to Mexico.

7            Your Honor, this is the -- as you heard testimony

8    that a lot of this transmigrante was dealt with in cash, so we

9    don't even have a full understanding of all the wealth that is

10   out there, and I believe some comments even in the pretrial

11   report referenced things not being able to be verified.

12           Your Honor, we have a specific example of Mr.

13   Martinez trying to conceal his wealth when we talk about the

14   private plane that he had and often utilized to travel within

15   and outside the country.  That plan was falsely registered to

16   his pilot and the pilot advised investigators that that was

17   done so to conceal the wealth that Mr. Martinez has.

18           Your Honor, as you referenced, it looks like the case

19   is on track for trial.  And if the jury is to accept this

20   evidence and convict Mr. Martinez, he could be facing quite a

21   lengthy sentence, which could create a motive for him to flee

22   prosecution of this case and flee this jurisdiction, coupled

23   with the fact that we've provided evidence that Mr. Martinez is

24   an individual who has the means and the ability to flee the

25   country, flee the jurisdiction, and flee prosecution.

1    Your Honor, for all these reasons, we are asking that

2    you continue to hold Mr. Martinez detained until trial in this

3    matter.  Thank you for your attention today.

4    THE COURT:  All right.  Argument.

5    MR. SCHAFFER:  What they didn't tell you, Your Honor,

6    is that Mr. Martinez hasn't had that plane since 2016, seven

7    years ago, before the time he's even involved in the

8    transmigrante business.

9    The government's whole argument, as far as the way

10   that all the FBI reports read, we believe, we think, we wish,

11   we hope.  The length of their argument didn't talk about and

12   what their presentation didn't talk about is evidence.  This is

13   not a presumption case.  This is a case where the government

14   has a burden of proof on the danger.  They have to show you by

15   clear and convincing evidence that no conditions exist that

16   will reasonably assure the safety of the community.

17   To show flight, they have to show that by a

18   preponderance of the evidence.  They've shown no (sound drops)

19   to substantiate either of those claims.

20   As far as danger to the community, the question is

21   the evidence clear and convincing.  I don't know how it could

22   be even arguably.  I think that's why the prosecutors says,

23   well, we think, we believe, because they have to show you with

24   evidence that this man poses a danger to the community that no

25   conditions will overcome.

```
 1            Here's what they showed.  They came up here, this
 2   agent came on and he testified about six or seven different
 3   matters that come straight out of the indictment.  It was
 4   probably the first time in my 40-year career I've said to a
 5   witness, what evidence do you have to show my client is
 6   involved.  And you know from all the cases you had a trial
 7   lawyer, that's something that generally lawyers don't do.
 8            But the problem is after reviewing thousands and
 9   thousands of pages of records, it's like, well, there's no
10   evidence that Mr. Martinez actually did anything.  So the best
11   that he could come up with, and he even told me as far as the
12   shooting of Rosio Aldrete and Consuelo, there's no evidence.
13   As far as Consuelo's claim when she came in with E.O. and E.O.
14   says, well, yeah, I got beaten up and as the beaters were
15   leaving, they said, oh, we work for Quanta.
16            The agent then admits, after looking at the FBI
17   report I showed him, that Consuelo is going around telling
18   people to say that to make it look like Mr. Martinez is
19   responsible even when he's not.  We went through each of the
20   things that he testified on direct and he admitted, except when
21   we got to L.B., that he had no evidence to substantiate.
22            As far as the L.B. thing where the guy sees through a
23   blindfold who it is that's kicking him 10-11 years ago, that
24   testimony is uncorroborated and it's L.B.'s story.  You know a
25   little bit about L.B. now because we were able to get through
```

1    this agent this man's been arrested numerous times and actually

2    in prison in Mexico, was in prison for two years while all this

3    2017 to 2018 and 2018 to 2019 period when this transmigrante

4    investigation was going on, and Consuelo works for him, and

5    he's an organized crime figure down in Mexico.

6         As I was trying to show you, and you told me it

7    wasn't necessary, he runs a paramilitary group of mercenaries

8    and there's pictures of them with his full uniform on under

9    investigator for the murder of four American citizens.  And

10   this is the man that says in 2017 he got in Mr. Martinez's face

11   when Mr. Martinez says we ought to work them together and told

12   him that.

13        But here's the important thing about all of these

14   allegations of violence: they're all four to five years old.

15   The government didn't find out about them a month ago, six

16   months ago, even a year ago.  These debriefing reports that I

17   had this agent testify to, like, where E.O. came in and talked

18   to the government, it was three days after it supposedly

19   happened.  The stuff with L.B., the government heard that back

20   in 2018 -- back in 2017-2018.  The government knew all this.

21        So to come in here now and claim you need to lock

22   this man up because he poses of risk of danger to the

23   community, well, if he's that dangerous, why did they let him

24   run around for the last four or five years.  And what are the

25   odds that in the last four to five years, much less his whole

1    life of 36 years, he's never been in trouble before.

2            And that's the other thing when we start talking

3    about risk of flight.  This man was born in the United States,

4    almost all of his family lives in the United States.  He has no

5    prior criminal record.  He does have homes in other places,

6    which there are conditions you can impose that would deal with

7    that.  But they pointed earlier to the fact that, well, he

8    makes trips in and out of the country; therefore, he poses a

9    risk of danger to -- a risk applied.

10            Look at the other defendants that you've heard

11    testimony about who are on bond, all of them live down in the

12    Rio Grande Valley area, all of them are in the transmigrante

13    business.  Mr. Medina, who supposedly is Carlos Martinez's

14    right-hand man, makes 33 trips across the Mexican and American

15    border during this same time period; he's on bond, $100,000

16    bond, secured bond.  He doesn't even have a curfew.  Mr.

17    Yzaguirre, 255 trips back and forth in that one-year period.

18    Miranda Mireya, 61 trips.  Sandra Medina, 133 trips.

19            So the fact that this man made 16 trips across the

20    border really means nothing.  He could have -- and he even told

21    you, it's different for people that live in the valley;

22    crossing the border is not a big deal.  If I go to Mexico, it's

23    going to be on Facebook.  If they to go Mexico, the people that

24    live in the valley, just another day at the office, no big deal

25    at all, and that's what the agent told you.

1          They also told you that this man had no false

2    identification on him at the time of his arrest, but they

3    decided to arrest him and it was very easy to; they knew right

4    where he'd be.  They knew he was eating dinner at a restaurant;

5    they went there and they arrested him.  He did not resist; he

6    was not trying to flee.  He did nothing to try to obstruct

7    justice.

8          You heard that every time he would -- well, many of

9    the times he would come back into the United States these 16

10   times, the agent told you, yeah, he was pulled into secondary

11   -- you know what secondary is -- he was questioned.  No reports

12   of him being uncooperative, untruthful.  They'd ask him why he

13   was going back and forth; he told them exactly why.

14         The other thing he told me after trial -- I forgot to

15   do this -- has to do with the tape.  He was interviewed for two

16   solid hours upon his arrest and told them I don't need a

17   lawyer.  I didn't do anything wrong; I don't need one.  But

18   they said, well, you might be looking at the death penalty.  He

19   goes, well, I don't care, I didn't do anything, and he told

20   them, I joined this transmigrante business in I think 2016.

21         Then he said, you know, at the time I joined, yeah,

22   they had disagreements because everybody was undercutting each

23   other, you couldn't make any money, so they had this agreement.

24   When I entered the business, that was already there; that was

25   just part of the way things worked.

1          But he also told them about being shaken down by the

2     cartel.  He told them the cartel down at -- the Gulf Cartel in

3     Matamoros was shaking him down at the casino that he has an

4     investment in.  Because he owns a piece of property, they built

5     a casino on the property, and instead of money, he gets a

6     percentage, and explained the whole thing to the agents, but

7     they knew it already.

8          They asked him about bribes he was having to pay to

9     the cartel and he's telling them, yeah, get extorted all the

10    time and when I refused to do it, they shut off my electricity

11    and I couldn't reconnect it.  The government would not help me

12    because they weren't going to get in the middle, so I had to

13    pay the cartel in order to get my lights back on, just like

14    they do to every other business owner in Matamoras.  He doesn't

15    know (indiscernible) with the cartel at all.  He told the

16    government about one of the cartel officials in Matamoras who

17    wanted to have him killed, so he doesn't go across the border

18    anymore because he's afraid of them and didn't want anything to

19    do with it.

20         This man is not a flight risk, but if the Court is

21    inclined to think that it's possible and that require

22    conditions this Court could impose to ensure that it's

23    reasonably likely that he will appear in Court and not violate

24    any of the laws of the United States or the State of Texas.

25         You already have somebody who will act as the third-

1    party custodian that will let Mr. Martinez live in his home

2    here in the Houston area.  The Court can impose 24-hour-a-day

3    lockdown, at least in the beginning, until the Court's

4    comfortable with lifting that if the Court ever is.  He could

5    wear a GPS monitor.  That way, if he got 10 feet away from this

6    individual's house, an alarm will go off.  It's not like being

7    on the border where if Mr. Marcum Medina decides he's going to

8    run, by the time the signal goes off in the government's

9    office, Mr. Medina's across the bridge, which is 100 feet away.

10            In this case, Mr. Martinez would be on Tomball, Texas

11   24 hours a day, 7 days a week.  Why is that important to me?

12   It would be for this reason: one of the exceptions I would ask

13   you for is that he be permitted to be in my office during

14   normal business hours when, you know, Mr. Kennedy and I, Mr.

15   Ballesteros and Miss Walker where one of this is there so that

16   he can work with us in the preparation of this case.

17            And I know that you said at the last hearing you

18   didn't want to get too far into the amount of discovery and

19   things like that, but it's a monstrous amount of discovery.

20   That's why we filed a supplement with the case with Mr. Zane,

21   who Judge Hanen can (indiscernible) to, and in that case, there

22   wasn't nearly as much evidence as in our case.  It's foreign

23   language, we listened to these tapes.  I mean, we haven't put a

24   dent in it.  And you saw in the latest supplement about Mr.

25   Ballesteros himself has several dozen visits, a hundred hours'

```
1   worth of work just visiting with Mr. Martinez.  There's no way
2   to prepare this within a year or two.
3           But if he's in my office, he could have -- there's a
4   room that he would be in for eight hours or however many hours
5   he's there a day, access the computers, recording equipment,
6   where he could look at the discovery.  We could make sure he's
7   not on the internet because whatever order this Court sees fit.
8   But I point out this would be during that time and then he
9   returns to where this third-party custodian is living.
10          In addition to that, the Court can impose even a
11  higher amount than normal and because we have other third-party
12  -- other people who are willing to be cosigners on the bond.
13  The significant thing about that is pretrial is recommending
14  the bond in this case.  We are agreeable to harsher conditions
15  to what they call.  And the interesting thing is every single
16  person that they recommended a bond for in this case is on bond
17  -- Marco Medina, Yzaguirre, all of them -- and none of them in
18  the last six months has violated their bond.
19          Mr. Martinez will not violate his bond.  He has no
20  history of every violating any type of bond, of being in
21  trouble.  He's prepared to fight this case.  He's got all of us
22  sitting here at this table working hours and hours a day to go
23  to trial in this case.  He is not going to run.  He intends to
24  fight this.
25          I think you know from the presentation from the
```

```
 1   government today, this case is not nearly as strong as they
 2   were hoping and wishing it would be.  And, of course, the
 3   weight of the evidence is another factor that the Court is
 4   supposed to consider in determining whether or not there'll
 5   ever be a bond.
 6              That's all I have.
 7              THE COURT:  All right.  Anything else?
 8              MS. TAYLOR:  No, Your Honor.
 9              THE COURT:  Well, I don't know, give me five minutes.
10        (Recess)
11              CLERK:  All rise.
12              THE COURT:  Okay.  I think I can just tell you it
13   sounds like there's a lot going in this case.  I don't know how
14   it's all going to pan out.  I don't know who's been let out on
15   bond and who's not been let out on bond or why.  I'm making a
16   decision in this case and in this case only.
17              One.  I believe L.G. is a bad person.  Probably Ramos
18   is -- maybe Ramos is doing bad things, you know, L.G. -- sorry
19   -- L.B.  These are all -- it sounds like they're all criminals
20   to be honest with you.  It sounds like the whole kit-and-
21   caboodle are criminals and that they're all hurting each other
22   and they're all threatening each other and they're all
23   extorting each other and they're working with the Mexico
24   government to make money off of people who are trying to bring
25   cars through Mexico into Central America; that's what it sounds
```

```
 1   like to me.
 2          And these things are corroborated.  You know, Exhibit
 3   9 are text messages showing what L.G. owes and these are on --
 4   you know, these are with Martinez, out of his iCloud account or
 5   whatever else.  You know, and I'm not saying that his wife was
 6   doing something wrong, but the day after he's arrested, she's
 7   there with $375,000 of envelopes of money, you know, with his
 8   fingerprints on it, for example.  I'm just giving -- you know,
 9   we all heard the evidence and I'm not going to sit here and
10   repeat it.
11          I think on -- I disagree with you.  I think the
12   evidence shows that he's involved.  I think the evidence shows
13   that he's involved with a lot of bad people and I think that
14   his involvement spans into Mexico, and I think that he's got
15   legitimate business concerns in Mexico and illegitimate
16   business concerns in Mexico and a residence in Mexico.  Now, I
17   don't know, maybe he wouldn't flee to Mexico, but he's
18   certainly got the means to do so.
19          And when I look at all of the factors, I just sort of
20   look at all of the factors I'm supposed to look:  We have ties
21   to a foreign government -- or a foreign country; we've got
22   business ties, family ties to a foreign country; we've got, you
23   know, criminal ties there.  We've got definitely -- you know, I
24   get it, it's 10 years ago but, you know, he's been involved in,
25   according to the evidence that I have -- I don't know if he
```

1    could see through some bandana or not, but that's the evidence

2    I have.  That this person L.B., who's also a terrible person it

3    sounds like; what you're telling me, he's a terrible person.

4    So a terrible person got kidnapped by Mr. Martinez is, I guess,

5    where I'm at with it.

6           And when I combine that with the fact that, you know,

7    in particular in connection with the L.B./L.G. situation, you

8    know, people are being shot and murdered and dying from

9    shootings and having stabbings in the head.  And it's all very

10   much related to this Los Indios port of entry, centering around

11   this conspiracy that -- and like it or not, there's probable

12   cause.  There's an indictment; there's probable cause that

13   actually does matter.

14          And I know, you know, again, when I combine all these

15   things with ties to a foreign country, ability to flee, you

16   know, almost every -- I get it that Miss -- what's her name? --

17   R.R. or whatever the first one was, maybe she's trying to get

18   people to blame him for things maybe she's doing.  I'm not

19   really sure, but it's more than just her, that people are

20   saying, you know, this is what happens when you cross Quanta.

21          So I find -- I'm not going to find by clear and

22   convince- -- just to be clear, if you appeal this, I'm saying

23   here and Judge Hanks can disagree with me.  I'm not going to

24   find by clear and convincing evidence that he's a danger that

25   could not be ameliorated, but those dangerousness factors play

1    into why I think by a preponderance of the evidence that he's a

2    risk of flight, meaning if...

3              And I appreciate the family, okay.  I'm not

4    diminishing your presence here or your love of him or your

5    trust of him, and I appreciate your efforts and I appreciate

6    you being here.  I just need to do what I think is right.  I

7    just think that you all don't know what he's into is what I'm

8    saying and I'm saying it directly to you.  And so, I don't

9    think having a bunch of people signing on a bond is going to

10   solve the problem.

11             So I find by a preponderance of the evidence that

12   there are no conditions that would assure his appearance;

13   that's my only finding.  And I just want to be clear that what

14   I'm saying is but for -- I just don't think he's going to

15   follow my conditions given the facts as I'm seeing them here,

16   given the conduct that he's involved in.

17             And so, for those reasons, he's detained pending

18   trial, and your lawyers know how to appeal this to Judge Hanks.

19   He's right downstairs or upstairs or wherever he is and is very

20   familiar with this case and might very well disagree with me.

21   So if there were exhibits that were actually admitted, so do we

22   want to know which ones those are, government's exhibits.

23             MR. SCHAFFER:  (Indiscernible).

24             THE COURT:  Huh?

25             MR. SCHAFFER:  Since the case will be appealed, I'll

```
 1    offer all of those be part of the record.

 2              THE COURT:  All of what?

 3              MR. SCHAFFER:  All the exhibits.

 4              THE COURT:  All the government's exhibits?

 5              MR. SCHAFFER:  All the ones that have been...

 6              THE COURT:  I have government -- look, the things

 7    you've handed me, you named a bunch of exhibits and you asked

 8    him questions about them, but I don't recall you offering any

 9    of them.

10              MR. SCHAFFER:  Okay, that's all right.  I don't know

11    where they are.  Do you have them?

12              THE COURT:  I'm showing you what I Have.  So your

13    Exhibit 3, which is the agreement is admitted, right, and then

14    government's Exhibit No. --

15              MS. TAYLOR:  I believe it's 9 through 13, Your Honor.

16              THE COURT:  For some reason, my version -- just a

17    minute.  Just a minute.  We didn't get to admitting 1, 2, and

18    3.  You didn't even offer 4, 5, or 6 or 7.  We admitted 9,

19    which is the list of monies L.G. owed.  You didn't offer 10.

20    And then we admitted 11, 12, and 13, right?

21              MS. TAYLOR:  That's correct, Your Honor, yes.  Thank

22    you.

23              THE COURT:  And then did you offer other exhibits,

24    Mr. Schaffer, other than 3?

25              MR. SCHAFFER:  No, sir.  I used them to refresh the
```

1    agent's recollection.

2          THE COURT:  And that's fine, they don't -- so they're

3    not made part of the record.

4          MR. SCHAFFER:  I think he must have taken them.

5          THE COURT:  If you all want -- I mean, that's the

6    problem.  If you didn't make it part of the record and I don't

7    have it, I didn't rely on it, and so it really, in all

8    fairness, should not be part of what the district judge sees.

9    The district judge should send back to me if there's some other

10   piece of evidence that you want me to look at that I didn't

11   look at is how that's supposed to work.

12         MR. SCHAFFER:  Well, I think the agent needs to read

13   them anyway, so he can keep them.

14         THE COURT:  Okay.  Anything else?

15         MS. TAYLOR:  No, Your Honor.

16         THE COURT:  Anything else?

17         MR. SCHAFFER:  No, sir.

18         THE COURT:  All right, you're excused.  Thank you.

19         (Hearing adjourned at 5:09 p.m.)

20                         * * * * *

21

22

23

24

25

1                            I N D E X

2

3                                RULINGS

4                                                    Page        Line

5   Detained Pending Trial                           122         17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 16, 2023
```